# Donnelly v. Lehigh Navigation Electric Company, Appellant.

*Negligence—Master and servant—Electric companies—Duty to furnish safety appliances—Obvious danger—Death—Assumption of risk—Contributory negligence—Custom of business.*

1. Electric companies are bound to use the highest degree of care practicable to avoid injury to every one who may be in lawful proximity to their wires, including employees, and, in the fulfillment of this obligation, it is the duty of such a company to know what safety appliances are suitable and in common or ordinary use for the protection of men employed to work in close proximity to currents which may prove fatal.

2. When a particular safety appliance has become in general use by others in the same line of business, it is the duty of an electric company to furnish its employees with the protection which that device affords, and if an employer fails so to do, a workman who has no knowledge of the existence of such an appliance cannot as a matter of law be held to have assumed dangers which would have been obviated by its use, unless such dangers are so apparent and imminent that no reasonably careful person would risk them.

3. If an electric company fails to furnish a safety appliance in general use by others in the same line of business, the employer, and not the employee, assumes the risks of the situation.

4. Where an employee of an electric company connects live wires without shutting off the current, but where it clearly appears that it is the practice, custom and usage of the business to make such connections on live wires, an employee cannot be held guilty of contributory negligence, as a matter of law, in so doing.

5. In an action to recover damages for the death of plaintiff's husband, it appeared that deceased was a lineman in the employ of defendant electric company, engaged in connecting insulated live wires. The wires deceased was engaged in connecting carried a current of 4,400 volts. Other lines running on the same pole immediately over his head carried 22,000 volts. To the higher voltage wires switches were attached which were open and alive with the blade hanging down. It appeared that deceased had been killed by an electric shock, and there was evidence that he had come in contact with both the switch blade and the wires of lower voltage, but it did not appear conclusively which contact caused his death. There was evidence that when a switch blade was hanging down, such as the switch blade with which deceased came in contact, the line was supposed to be dead at that point, and that to have the blade hanging down with the wire alive was more dangerous than the customary arrangement employed by others in the same line of business. There was further evidence that it was customary in the electric business to furnish employees with hollow cylinders of rubber to clamp around live wires which rendered them harmless, and that defendant's men had never been supplied with such devices, and further evidence that if such devices had been supplied, the accident would probably have been avoided. Defendant contended that deceased assumed the risks of his employment, and also that he was guilty of contributory negligence in connecting live wires without shutting off the current. The trial judge submitted the case to the jury which found a verdict for plaintiff upon which judgment was entered. *Held,* no error.

*Trials—Models—Exhibits—Reference to models—Explanations upon record—Practice, Supreme Court—Appeals—Presumption.*

6. Where models have been used at the trial of a case to which the witnesses have referred by the use of such words as "here" or "there," without any explanatory notes being placed upon the record to show what was meant by these expressions, so that the witnesses' meaning was not evident, it is to be assumed, on appeal, that such testimony supports the verdict of the jury.

Argued May 1, 1917.   Appeal, No. 86, Jan. T., 1917, by defendant, from judgment of C. P. Northampton Co., Dec. T., 1915, No. 35, on verdict for plaintiff, in case of Tillie M. Donnelly v. Lehigh Navigation Electric Company.   Before Brown, C. J., Mestrezat, Moschzisker, Frazer and Walling, JJ.   Affirmed.

Trespass to recover damages for the death of plaintiff's husband.   Before McKeen, J.

The opinion of the Supreme Court states the facts.

Verdict for plaintiff for $2,420 and judgment thereon. Defendant appealed.

*Errors assigned* were in refusing to direct a verdict for defendant and in refusing to enter judgment for defendant n. o. v.

*W. H. Kirkpatrick,* of *Kirkpatrick & Maxwell,* with him *John R. Sharpless* and *W. F. Marshall,* for appellant.—The testimony establishes that the accident was caused by Donnelly's legs coming in contact with the lower or 4,400-volt line.

Donnelly assumed the risk arising from coming in contact with the 4,400-volt line: Myers v. Edison Elec. Illum. Co., 225 Pa. 387;  Haertel v. Penna. Light & Power Co., 219 Pa. 640.

Donnelly assumed the risk arising from coming into contact with the hanging switch blade:  Bowen v. Penna. R. R. Co., 219 Pa. 405;  Masterson v. Eldridge, 208 Pa. 242;  Nuss v. Rafsnyder, 178 Pa. 397;  Reed v. Norristown Electric Light & Power Co., 223 Pa. 591.

Donnelly was guilty of contributory negligence: Weir v. Haverford Elec. Light Co., 221 Pa. 611;  Hart v. Allegheny County Light Co., 201 Pa. 234.

The place where Donnelly was working was reasonably safe according to the usage and practice of the business he was engaged in.

*H. F. Laub,* of *Smith, Paff & Laub,* for appellee.—Donnelly's death was caused by coming in contact with the hanging switch blade.

At all events, the question of how Donnelly met his death was for the jury: Hockenberry v. New Castle Electric Co., 251 Pa. 394.

Donnelly did not assume the risk arising from coming in contact with the 4,400-volt line, as contended by the defendant: Rummell v. Dilworth, Porter & Co., 131 Pa. 509; Doyle v. Pittsburgh Waste Co., 204 Pa. 618; Bartholomew v. Kemmerer, 211 Pa. 277; Bannon v. Lutz, 158 Pa. 166.

Donnelly did not assume the risk arising from coming in contact with the hanging switch blade: Bardsley v. Gill, 218 Pa. 56; Leonard v. Nazareth Cement Co., 49 Pa. Superior Ct. 535; Philadelphia, Wilm. & Balt. R. R. Co. v. Keenan, 103 Pa. 124; Bonner v. Pittsburgh Bridge Co., 5 Pa. Superior Ct. 281; Raymer v. Standard Steel Works, 216 Pa. 101.

The accident was not due to the contributory negligence of the deceased.

OPINION BY MR. JUSTICE MOSCHZISKER, June 30, 1917:

August 27, 1915, John H. Donnelly, a lineman, was killed by contact with an electric current, while working upon certain wires owned and maintained by his employer; deceased's widow sued in trespass, alleging negligence, and recovered a verdict for $2,420, upon which judgment was entered; defendant has appealed, and complains because the court below refused to enter judgment in its favor non obstante veredicto.

At the time of the casualty, Donnelly was perched upon a cross-arm, engaged in "tapping" or connecting wires which were insulated according to the customary method used for outside electric lines; these wires carried a current of 4,400 volts. Other lines of defendant company, carrying 22,000 volts, ran on the same pole, immediately over Donnelly's head, and to each of these

latter wires a switch was attached, the one here concerned being open and alive, with its blade, bar, or needle hanging down.

Plaintiff introduced no positive testimony to show whether her husband's death was due to contact with the lower or higher voltage lines, either of which was sufficient to kill. It was proved, however, that the dead man's head was burned; and an examination of the hanging switch blade disclosed several singed hairs thereon. These circumstances were enough to justify a finding that Donnelly's head had touched the higher voltage wires; but, since his body showed burns on the left leg and other parts, all the witnesses called by plaintiff were obliged to admit they did not, as a matter of fact, know which contact was responsible for the fatality.

It appears that, in the end, the deceased fell prostrate upon the 4,400-volt line; and, in this connection, certain of plaintiff's experts testified that "contact with a highly charged object......sometimes will throw...... a human being," and, after receiving a shock from the 4,400-volt wires, if Donnelly "had his legs on [that] ......line, it would never have held him there." All of which, if believed, indicates that touching the upper rather than the lower wires was the cause of death in the present instance; but from the testimony of a man named Urban, an alleged eye witness for the defense, it would appear that Donnelly first came in contact with the 4,400-volt line, whereupon "he straightened up, his head struck the needle of the switch......and that knocked him back and he fell across these [the lower voltage] wires."

On Mr. Urban's testimony, defendant contends that, the former being the only person who even asserted that he saw Donnelly's actions immediately before and at the time of the latter's death, in the absence of specific contradiction, the jury was bound to accept his evidence as conclusive, and thereunder only one finding was pos-

sible, i. e., that contact with the lower voltage wires was the fatal one. Later in this witness's examination, however, he said, "That [indicating the needle] is what fixed his feet" [evidently meaning "what caused Donnelly's death"]; and, when subsequently called to the stand, defendant's foreman flatly contradicted certain parts of Mr. Urban's testimony, thereby impeaching his credibility. Under these circumstances, it cannot be said the jury were bound to accept the word of defendant's witness as verity.

If as a matter of fact the higher voltage wires caused Donnelly's death, and if, (according to the customary method used by electric companies), when a switch of the character of the one in this case is found with its blade hanging down, this indicates that the line is dead at that point, as was testified by several of plaintiff's experts, then the evidence relied upon by plaintiff was amply sufficient to sustain a finding that the method of installing switches followed in the present instance, i. e., so they would have the blade hanging down with the wire alive, was out of the ordinary, and much more dangerous than the customary arrangement employed by others in the same line of business. Although this testimony, that a hanging switch blade indicates a dead wire, was denied by some of defendant's witnesses, yet, since believed by the jury, we must, for present purposes, accept it as true; and thereunder, if contact with the live switch was the proximate cause of the accident, defendant company was guilty of such negligence as would make it responsible to plaintiff for the death of her husband.

The position taken by defendant, however, is that, even conceding, for the sake of argument, its switch was negligently constructed and, when Donnelly saw the needle hanging down, he had a right to assume it was dead, yet there can be no recovery here, since the evidence relied upon by plaintiff does not make it plain whether it was this alleged negligence or contact by de-

ceased with the lower voltage wires which caused the fatality. This contention is based upon the theory that, when defendant set Donnelly to work upon the 4,400-volt wires, he, and not it, assumed all risks therefrom; but there was abundance of testimony produced by plaintiff, and not very strenuously denied, to the effect that, in the electrical business, it had been and was customary for employers to furnish linemen with what are termed "pigs," or "piggies" (hollow cylinders of rubber, about three feet long, which, after being clasped about live wires, render the latter innocuous to those who may touch or come in contact with them), and that defendant had failed to observe this custom, its men never having been supplied with such safety appliance or any efficient substitute therefor. Moreover, it was proved by plaintiff's witnesses and admitted by those of defendant that, if Donnelly had been furnished this device, the accident which caused his untimely death would, in all probability, have been avoided; and, in view of this testimony, plaintiff contends that, if contact with the lower voltage wires was the proximate cause of her husband's death, then his employer was guilty of negligence in failing to furnish him with the usual and ordinary protection against that danger, and the defense of assumption of risk would not avail.

It is established in our law that "electric companies are bound to use the highest degree of care practicable to avoid injury to every one who may be in lawful proximity to their wires" (Haertel v. Pennsylvania Light & Power Co., 219 Pa. 640, 643; Fitzgerald v. Edison Electric Illuminating Co., 200 Pa. 540, 543; Yeager v. Edison Electric Co., 246 Pa. 434, 436), including employees, and that, in the fulfilment of this obligation, it is the duty of such a company to know what safety appliances are suitable and in "common and ordinary use" for the protection of men employed to work in close proximity to currents which may prove fatal (Bannon v. Lutz, 158 Pa. 166, 174; Morrison v. So. Penn Oil Co., 247 Pa.

263, 266). Furthermore, when a particular safety appliance has become in general use by others in the same line of business, it is the duty of an electric company to furnish its employees with the protection which that device affords, and if an employer fails so to do, a workman who has no knowledge of the existence of such an appliance cannot, as a matter of law, be held to have assumed dangers which would have been obviated by its use, unless such dangers are so apparent and imminent that no reasonably careful person would risk them; on the contrary, when the hazards are not of that character, if an electric company fails to furnish a safety appliance in general use by others in the same line of business, then the employer, and not the employee, assumes the risks of the situation.

While the testimony produced by plaintiff shows that the safety appliances previously referred to, known as "pigs" or "piggies," were in general use, yet, under the evidence in this case, it was quite possible that Donnelly was not informed upon the subject. Again, while plaintiff's proofs indicate that the usual and customary method of insulation for outside wires, with a voltage as high as 4,400, is not safe, because the current will "break ......or carry......through"—the covering not being "much good"—yet this testimony does not show with any exactness the extent of the danger therefrom. Two of defendant's witnesses testified, however, that the extent to which the electric fluid will come through "depends upon the weather," that, in certain instances, it will "work through......in damp weather," but "in extra dry weather you wouldn't get a shock." On this state of the evidence, there being nothing to show the weather conditions when Donnelly was killed, defendant cannot successfully contend that the dangers from the 4,400-volt wires were so obvious and imminent that no reasonably careful person would have risked them. In other words, we concur in the views expressed by the court below, and feel it cannot be held as matter of law

either that "decedent had knowledge that 'rubber protectors,' or 'piggies,' were required to make the wires upon which he was working reasonably safe," and assumed the risk of working without them, or that "he should have had knowledge the switch blade was charged" and assumed that risk. These matters, and all issues relevant thereto, had to go to the jury for determination; therefore, whether as a matter of fact Donnelly's death was due to contact with the highly charged switch blade or with the lower voltage wires, in either event judgment could not properly have been entered contrary to the verdict.

On the question of contributory negligence: Although, at the time of the casualty, Donnelly was engaged in "tapping" live wires, yet the testimony of defendant's own witnesses shows that it was "the ordinary, general practice, custom and usage of the business to make taps on a live wire......of 4,400 voltage," without attempting to shut off the current; hence it could not be held as a matter of law that deceased was guilty of contributory negligence in so doing. Moreover, as said by the learned court below, "it must be assumed he observed the ordinary care which a man of his experience would exercise......, and before the court could hold otherwise, the facts must be clear and conclusively established so as to preclude any other inference." Finally, plaintiff's husband was equipped with proper gloves, the only other customary safeguard which he lacked being the previously described rubber cylinders, or "piggies"; and, on the facts in this case, it was for the jury to say whether, in the absence of this latter protection, it was contributory negligence for him to engage in the work upon which he was employed when the accident happened.

One other matter calls for notice. A model was used throughout the trial; and in the 183 pages of testimony (which we read with the utmost care) may be found many instances where witnesses, both for plaintiff and

defendant, referred to this model by pointing out its various parts, using indicative words such as "here" or "there," etc., without any explanatory notes being placed upon the record to show what was meant by these expressions. In every instance of this kind where the witness's meaning is not evident, we have assumed, following the rule laid down in our recent decisions, that the testimony in question supports the verdict found by the jury: see Wagner v. Standard Sanitary Mfg. Co., 244 Pa. 310, 316; Fortney v. Breon, 245 Pa. 47, 53; Maurer v. Rogers, 250 Pa. 447, 450.

The assignments of error are overruled, and the judgment is affirmed.