# Commonwealth *v.* Principatti, Appellant.

*Criminal law—Murder—Self-defense — Voluntary manslaughter —Evidence—Threats—Remoteness—State of mind — Self-serving declarations—Character witnesses—Distinction between justifiable homicide and manslaughter—Remarks of district attorney—Reputation of deceased—Courts—Power to exclude hearers—Indications of distances, etc., by hands of witness—Record—Review on appeal —Presumption—Discretion of court—Collateral issues—Charge.*

1. In a trial for murder, where the defense is self-defense, the accused has the right to present evidence of alleged threats made by deceased against him and their effect upon him, as well as to prove his state of mind by his own or other competent testimony.

2. At a trial for murder, it appeared that deceased and defendant had lived in the same boarding house; that one evening, defendant and several others were assembled in the dining room; that deceased walked up to a member of the group and said that he wanted to say something to him and beckoned him to follow; that the two walked into the yard when defendant appeared and shot deceased without warning, killing him; a stiletto, three loaded cartridges, and a razor were found upon deceased, and a pistol near the spot where the dead body lay. Thereafter, defendant admitted the killing and gave himself up to a constable. Defendant testified that he left the room for the purpose of going into the yard; that he saw deceased and the man whom he had called standing together; that when deceased saw him, he pulled his hand out of his overcoat pocket and defendant saw a revolver; and that when he saw that revolver, he pulled his revolver and shot; that he was so scared, when he fired the first shot, a minute or two afterwards he fired the second; defendant offered to prove that deceased had conversed with him about nine days prior to the killing; had said that he was a member of the Black Hand Gang, and had been sent to murder defendant for the reason that defendant had previously killed a member of that organization; that deceased could fix the matter up and prevent defendant from being killed if he would pay

him $200; and if he did not pay deceased $200, deceased would kill defendant; that defendant promised deceased $200; that he knew deceased was a member of the Black Hand Gang, and that the Black Hand Gang was a society that extorted money under threat of murder; that defendant believed if he did not give deceased $200, the latter would kill him, but that he had not given him the money; that the night of the killing was the first and only opportunity deceased had to do defendant harm. Defendant further offered to prove that he had gone to a local constable to ask for protection. The lower court excluded the offers of evidence. *Held,* that the evidence should have been admitted.

3. Although the alleged threats were made at least nine days before the killing, that fact, under the circumstances of the case, does not destroy their relevancy on the ground of remoteness.

4. Where the fact that defendant surrendered himself and gave up his pistol to an officer of the law within an hour after the shooting, was put in evidence, the trial judge properly refused to permit defendant to be interrogated or to let in other evidence concerning his self-serving declarations at that time.

5. Where in such case the district attorney, in the hearing of the jury, objected to defendant's offers to prove that he was afraid of deceased, on the ground that the two men were eating and sleeping in the same house from the time of the alleged threat to the date of the killing, defendant was entitled to an opportunity to show that notwithstanding he had a common abode with deceased, the night the shooting took place was the first chance deceased had to do defendant harm.

6. Where in such case the district attorney stated in the hearing of the jury that if threats were made against the accused, instead of undertaking to secure his own safety, he should have gone to a proper officer of the law for protection, the prisoner had the right to show that he endeavored to do this, although by mistake, he applied to the wrong official.

7. The dividing line between self-defense and voluntary manslaughter brought about through the influence of a passion of fear, seems to be the existence, as the moving force, of a reasonably founded belief of either imminent peril to life or great bodily harm, as distinguished from the influence of an uncontrollable fear or terror, conceivable as existing but not reasonably justified by the immediate circumstances. If the circumstances are both adequate to raise and sufficient to justify a belief in the necessity to take life in order to save one's self from such a danger, where the belief exists and is acted upon, the homicide is excusable upon the theory of self-defense; while, if the act is committed under the influence of an uncontrollable fear of either death or bodily harm,

caused by the circumstances, but without the presence of all the ingredients necessary to excuse the act on the ground of self-defense, the killing is manslaughter.

8. While the fact that defendant, when he came out of the kitchen, saw the deceased draw a revolver from his overcoat pocket, would not in itself be sufficient to show a provocation which would justify killing in self-defense or even such a passion of fear as to reduce the alleged crime to manslaughter, the prior threats, and other facts of the case, might justify defendant in acting on a hostile demonstration of much less pronounced character than if such threats had not preceded the killing.

9. In such case, for the purpose of reducing the grade of the offense, the prisoner should have been permitted to show in defense that when he saw the revolver in the hands of deceased, he was thrown into such a passion of terror, in view of the threats that had been previously uttered, that he killed deceased under the influence of that terror.

10. Where in such case defendant testified that he knew the reputation of deceased to be a dangerous man; that, at the time of and prior to the killing, he feared the latter because he believed such reputation to reflect his real character, it was error to refuse to permit other witnesses to testify as to the reputation of the deceased on the ground that they had no personal acquaintance with the latter.

11. It is not enough to ask a character witness concerning the reputation of the deceased as "a bad and dangerous man"; the word "violent," or its equivalent, should be used.

12. Inquiry of character witnesses concerning the fact that defendant had been accused of killing another man is permitted only for the limited purpose of ascertaining the opportunities, sources and extent of knowledge of the witnesses on the point of the general reputation of defendant, and not to show that he was probably guilty of the other offense; and the court should instruct the jury as to the relevancy of such testimony.

13. Where in such case an Italian witness was produced by defendant and an offer was made to show that the witness had been told by deceased that he had been sent to kill defendant and would do it at his first opportunity, and the witness had communicated these facts to the defendant; but the witness refused to testify unless all other Italians were removed from the room, claiming he feared vengeance would be visited upon him if his testimony were heard by them, the refusal of the court to exclude such Italians, on the ground that it had no power to grant the application, was error, as it was within the discretion of the court to determine whether or not the application should be granted.

14. In such case, the omission of the court to refer in summing up the evidence to the threats which the deceased was alleged to have made against the defendant or their possible effect upon the mind of the latter, and failure to discuss the evidence as to the dangerous character of the deceased and its bearing upon the defense set up by the accused, were prejudicial to defendant as the jury were left without adequate instructions as to the defendant's theory of the case.

15. When witnesses by the action of their hands or otherwise undertake to indicate time, space, distance, or anything else, counsel eliciting the evidence in question should be careful to have an intelligible explanation placed upon the record, so that the testimony may be understood on review; otherwise, whenever the notes are not clear, the interpretation must be given them which supports the verdict.

16. Where defendant's face was badly scarred, it is not error to refuse an offer to show that this was caused by no fault of his own.

Argued Feb. 4, 1918. Appeal, No. 107, Oct. T., 1917, by defendant, from sentence of O. & T. Beaver Co., March Sessions, 1917, No. 3, on verdict of guilty of murder of the first degree, in case of Commonwealth v. Dominic Principatti. Before BROWN, C. J., POTTER, MOSCHZIS-KER, FRAZER and WALLING, JJ. Reversed.

Indictment for murder. Before CORBETT, P. J., specially presiding.

The opinion of the Supreme Court states the facts.

Verdict of guilty of murder of the first degree. The defendant was sentenced to be electrocuted. Defendant appealed.

*Errors assigned* were rulings on evidence and instructions to the jury.

*John B. McClure,* with him *Charles R. May* and *Harold F. Reed,* for appellant.—The trial judge erred in excluding evidence of the defendant concerning threats made by the deceased against him: Com. v. Lenox, 3 Brewster's Reports 249; Com. v. Colandro, 231 Pa. 343; Com. v. Salyards, 158 Pa. 501; Com. v. Keller, 191 Pa. 122; Com. v. Curcio, 216 Pa. 380; Com. v. Hazlett, 14 Pa. Superior Ct. 351.

The refusal to permit the defendant to state his reason for shooting was error: Com. v. Woodward, 102 Mass. 155.

It was error to refuse to withdraw a juror and continue the case upon motion of the defendant because of the prejudicial remarks of the district attorney: Com. v. Nicely, 130 Pa. 261.

*Louis E. Graham,* District Attorney, with him *Frank H. Laird,* for appellee.—There was no element of self-defense in this case: Com. v. Breyessee, 160 Pa. 451; Com. v. Ware, 137 Pa. 465; Com. v. Mitchka, 209 Pa. 274.

OPINION BY MR. JUSTICE MOSCHZISKER, March 18, 1918:

The defendant, Dominic Principatti, appeals from a judgment sentencing him to be electrocuted for committing murder of the first degree.

The evidence presents, inter alia, the following facts: Principatti and the deceased, one Tony Amodeo, had, for about eight months, lived in the same boarding house; on Sunday evening, February 18, 1917, the defendant and several others were assembled in the dining room of this abode, when, a little after seven o'clock, Amodeo walked in and remarked to one Joe Spitaro, "I want to say something to you," at the same time beckoning him to follow; the two walked out into the yard and stopped eight feet from the kitchen door; they had been standing thus about two minutes, the noise from a passing train rendering conversation impossible, when Principatti appeared, and, without uttering a word, shot Amodeo; then, in quick order, a second shot was fired, both bullets entering the head of the victim, who died at once; shortly after this, when the body of the deceased was examined, a stiletto was found fastened to a belt-hook under his clothes, three loaded cartridges were discovered in his trouser pockets, a razor in an inside coat

pocket, and a pistol was handed to the man who was engaged in making the examination, by an unknown onlooker who, apparently, picked it up near the spot where the dead body lay; immediately following the shooting, Principatti returned to the house and said to his sister, who was the landlady, "I killed him, I am going to surrender to the officers and the court, because he wanted to kill me"; and, on the same evening, defendant gave himself up to a constable, to whom he handed over his gun. There is no conflict of testimony on the above facts.

Spitaro, the only eyewitness to the alleged crime, said that, before the shooting took place, Amodeo had his hands in his overcoat pockets; but, when asked the question, "Did you see anything in his hands?" he replied, "No, sir, it was too dark." When Principatti took the stand in his own defense, he stated that, four or five minutes after Amodeo had departed with Spitaro, he, the defendant, left the room for the purpose of going to the toilet in the back yard; that, as soon as the kitchen door closed behind him, he saw Spitaro and Amodeo standing together, the latter with both hands in his overcoat pockets; that, "when he [Amodeo] seen me, he pulled his hand up this way [indicating], and I seen his revolver"; then the witness immediately added, "When I seen that [Amodeo's revolver], I pulled my revolver out and shot." In answer to the next question, accused said he was "so scared," when he fired the first shot, that "a minute or two minutes afterwards" he fired a second.

The foregoing references to the testimony and brief review of the material facts are sufficient to enable one to understand clearly the several matters before us for determination.

We gather, from offers of proof, requests for charge and other such matter upon the record, that the defense the accused endeavored to stand upon, but which, owing to a series of adverse rulings, was not fully developed, is as follows: That Amodeo had conversed with defendant on Friday, February 9, 1917, nine days prior to the

killing, and, on that occasion, the deceased said "he was a member of the 'Black Hand Gang,' sent over to New Galilee to murder the defendant," for the reason that the latter previously had killed a member of that organization; that he, Amodeo, however, "could fix the matter up, and prevent the defendant from being killed, if he would pay him the sum of two hundred dollars, and that if he did not pay the deceased the sum of two hundred dollars, he would kill the defendant"; that, thereupon defendant became frightened, and promised to give Amodeo the two hundred dollars on the next pay day, which occurred six days before the date of the killing; that defendant "had knowledge, at the time of the shooting and prior thereto, deceased was a member of the 'Black Hand Gang,' and that defendant knew and believed the 'Black Hand Gang' was a society of men who extort money from people under threat of killing"; further, that defendant believed, if he did not give Amodeo the two hundred dollars which he demanded, the latter would kill him; that, four days prior to the shooting, defendant, being in fear, went to see a constable in the neighborhood, and told the latter of the threat to kill, for the purpose of obtaining lawful protection. In short, the defense was that, while, at the moment of the shooting, Principatti intended to kill Amodeo, yet such intention was instantaneously impelled by the former's belief that he was in imminent danger of death, or it was the result of a passion of fear, influenced by Amodeo's previous threats, but immediately caused by the sight of the pistol in the hands of the deceased.

Fragments of this defense were permitted in evidence; but, in the main, accused was not given an opportunity properly to present his side of the case. His counsel repeatedly endeavored, by formal offers and specific questioning, to introduce the fact that Principatti was "afraid" of Amodeo, "frightened" and "scared" because of the latter's threat to kill him, together with the detailed circumstances attending this threat; he also

offered to prove Amodeo's connection with the so-called "Black Hand Society" and what that body was thought by the accused to be, its wicked objects, etc.; furthermore, he tendered evidence that the night of the killing was the first and only opportunity that "deceased had to do defendant harm," proposing to give details as to the latter's whereabouts from the time of the threat to the date of the alleged crime, in order to corroborate this last offer; finally, counsel for defendant proffered testimony concerning the action of his client, three or four days prior to the date of the alleged crime, in going to a local constable to ask for protection, this latter offer being made "for the purpose of showing that defendant attempted to pursue his legal remedy in reference to the threats; likewise, for the further purpose of showing that he feared the deceased and was afraid he would carry out his threat to kill him." The accused should have been given a fair opportunity to substantiate all of these offers by evidence.

As to the right to present evidence concerning the alleged threats by the deceased and their effect upon defendant, see Wharton on Homicide, 2d ed., secs. 610-11; Henry on Pennsylvania Trial Evidence, p. 33; 21 Cyc. 893, par. "e"; Underhill on Criminal Evidence, sec. 326; Com. v. Garanchoskie, 251 Pa. 247, 253; Com. v. Curcio, 216 Pa. 380; and Com. v. Keller, 191 Pa. 122, 132. On the defendant's right to prove his state of mind, either by his own or other competent testimony, see Com. v. Wooley, 259 Pa. 249, 251; 21 Cyc. 889, par. "b"; and opinion by RICE, P. J., in Com. v. Hazlett, 14 Pa. Superior Ct. 352, 369.

So far as defendant's offers relating to the "Black Hand Society" and Amodeo's connection therewith are concerned, in Com. v. Varano, 258 Pa. 442, 446, we recently said that, when sufficient reason exists therefor, an inquiry such as here attempted is permissible; and in Commonwealth v. Curcio, 216 Pa. 380, a case somewhat like the one at bar, we granted a new trial because

a defense of the same general character as the one now before us was not given due or proper judicial consideration at the trial there under review.

Since the district attorney, apparently in the hearing of the jury, repeatedly objected to defendant's offers to prove that he was afraid of the deceased, placing his objections upon the express ground that the two men were sleeping and eating in the same house from the time of the alleged threat to the date of the killing, the accused was entitled to an opportunity to show that, notwithstanding he had a common abode with Amodeo, the night the shooting took place was, in fact, the first chance the latter had to do him harm: see 21 Cyc. 954, par. "d."

When we come to consider defendant's endeavor, whether honest or otherwise, to secure the protection of the law, it appears that, during the course of the trial, the district attorney more than once stated, apparently in the hearing of the jury, that, if threats were made against the accused, instead of undertaking to secure his own safety, he should have gone to a proper officer of the law for protection; therefore, the prisoner had the right to show that he endeavored to do that very thing, and this even though, by mistake, he applied to the wrong official.

Finally, in connection with the several matters under immediate consideration, albeit the alleged threats by Amodeo against the defendant were made at least nine days before the killing, that fact, under the circumstances of this case, does not destroy their relevancy on the ground of remoteness: Com. v. Salyards, 158 Pa. 501; 21 Cyc. 892, par. V.

Perhaps some of the rulings assigned as error were partly cured by the subsequent admission of testimony originally refused; but the result of these rulings was unduly and prejudicially to hamper the presentation of the defense; and, so far as we are able to see, this was due to a failure fully to keep in mind certain applicable rules of law, particularly those dealing with the subject

of previous threats and their possible controlling effect upon the mind of the person against whom directed, and those relevant to the legal and psychological distinctions between justifiable homicide and voluntary manslaughter. In the latter connection we recently said: "The dividing line between self-defense and this character of manslaughter [voluntary, brought about through the influence of a passion of fear] seems to be the existence, as the moving force, of a reasonably founded belief of either imminent peril to life or great bodily harm, as distinguished from the influence of an uncontrollable fear or terror, conceivable as existing but not reasonably justified by the immediate circumstances. If the circumstances are both adequate to raise and sufficient to justify a belief in the necessity to take life in order to save one's self from such danger, where the belief exists and is acted upon, the homicide is excusable upon the theory of self-defense......; while, if the act is committed under the influence of an uncontrollable fear of either death or great bodily harm, caused by the circumstances, but without the presence of all the ingredients necessary to excuse the act on the ground of self-defense, the killing is manslaughter": Com. v. Colandro, 231 Pa. 343, 352.

In the case at bar, the trial judge, when ruling upon offers of evidence, seems to have entirely overlooked the fact that these offers, ex necessitate, brought into the case the element of manslaughter through fear. Apparently, the trial was conducted upon the theory that the deceased was not accused by the defendant of any actual menacing action at the time of or immediately before the killing, hence the latter's alleged fear rested upon no sufficient foundation; but this ignored the testimony of defendant that, when he came out of the kitchen door, just before the shooting, Amodeo turned toward him, at the same moment drawing a revolver which he, the prisoner, saw in the hands of the deceased. This fact, by itself, would not be sufficient to show a pro-

vocation which would justify killing in self-defense, or even such a passion of fear as to reduce the alleged crime to manslaughter; but, keeping in mind the rule of law that, in a case involving prior threats, one is "justified in acting on a hostile demonstration of much less pronounced character than if such threats had not preceded" the killing (21 Cyc. 893), it is quite conceivable that, if the competent testimony as to other relevant facts offered by defendant (i. e., concerning prior threats and the wicked character of the man who made them, the latter's connection with the "Black Hand Society," the nature of that society, and the resulting fear which pursued the defendant) had been given an opportunity to be heard and considered, the jury might have drawn conclusions therefrom favorable to the defendant, which would have affected the verdict.

As a witness for himself, the defendant testified he knew the reputation of Amodeo to be that of a dangerous man, and, at the time of and prior to the killing, he feared the latter because he believed such reputation to reflect his real character. When certain other persons were called by defendant to prove the character of Amodeo, the trial judge refused their testimony on the ground that these particular witnesses had no personal acquaintance with the deceased; this was error. It is not necessary to know one personally in order to have sufficient acquaintance with his reputation to give testimony concerning it; and this is so whenever one's character or reputation is properly at issue. Here, the reputation of the man killed by defendant was in question, for Principatti claimed that, because of the threats against his life made by Amodeo, when, immediately before the killing, he saw the pistol in the latter's hand, this, coupled with his knowledge of the reputation of the deceased as a "Black Hander" and dangerous man, raised a fear in defendant's mind, which influenced him to shoot at once for his own protection (21 Cyc. 889, par. "c," and p. 956, par. II; Underhill on Criminal Evidence, p. 386, sec.

324). Of course, it is always essential that one whose character is at issue shall be properly identified by those called to testify concerning it, so that the court may be satisfied no mistake occurs regarding the identity of the person; but, after this is made sure, then the proof of reputation is subject to the same rules of evidence as prevail when establishing the character of a defendant or any one else: Underhill on Criminal Evidence, sec. 325. Before leaving this branch of the case, it is but fair to state that, so far as the assignments show, the witnesses in question were asked concerning the reputation of Amodeo only as "a bad and dangerous man"; strictly, this might be objectionable because the word "violent," or its equivalent, is not used; but the ground upon which the testimony was excluded, i. e., lack of a personal acquaintance with deceased, was clearly wrong.

An Italian was produced by the defendant and the offer made to show that this witness had been told by Amodeo that he, the latter, had been sent to kill Principatti and would do it at his first opportunity; further, that the witness had communicated these facts to the defendant. This man, however, refused to testify unless all other Italians were removed from the room, claiming he was afraid vengeance would be visited upon him if his testimony were heard by them. Upon objection from the district attorney, the trial judge said: "The court is of opinion that it does not have the power to grant the application; therefore, the objection to so doing is sustained." A request of this character is within the discretion of the trial judge, and had the court below, in the exercise of its discretion, refused the one at bar, we would be loath to characterize such a ruling as reversible error; but, clearly, in the present instance the judge was wrong in ruling that he had no power to grant the application: Archbold's Criminal Practice and Pleading (8th ed.), vol. I, p. 539, n. 1; Bishop's New Criminal Procedure, vol. I, secs. 1188-90; 12 Cyc. 546.

During the course of the trial, certain character witnesses admitted on cross-examination that, two or three years prior thereto, they had heard Principatti accused of killing another man; but, in that connection, the district attorney admitted that "the grand jury ignored the bill against the defendant." It is alleged the representative of the Commonwealth, in summing up, said to the jury that, "three years before, the defendant, Dominic Principatti, had in cold blood killed a man, that it is true the grand jury disregarded the bill, and that unfortunately the district attorney, was a party thereto." If made, these remarks were highly improper, there being no testimony in the case that defendant had "in cold blood killed a man," or that the bill relating to the alleged crime had been ignored at the instance of the district attorney. We take it for granted, however, that no such mistake will occur at the next trial; hence, it is unnecessary further to discuss the matter.

Several of the assignments criticise the charge upon the ground that it either omits all reference to, or contains no sufficient instructions upon, the various important matters which came before the jury at trial. We shall briefly refer to such of these as we deem material. The trial judge said nothing about the threats which Amodeo is alleged to have made against the defendant, or their possible effect upon the mind of the latter; further, he did not, in his general charge, sufficiently refer to or discuss the evidence as to the dangerous character of the deceased, nor did he point out its bearing upon the defense set up by the accused. Although these omissions are possibly corrected by the affirmance of certain of the latter's requests, at the next trial all such material matters should be specifically referred to in the body of the charge; moreover, at that time, the trial judge should be careful not only to state all appropriate rules of law, but to point out their relevancy with sufficient explicitness to enable the jury intelligently to apply the law to the facts as it may find the latter to be:

Com. v. Smith, 221 Pa. 552, 553; Meyers v. Com., 83 Pa. 131, 143, PAXSON, J.; Com. v. Colandro, 231 Pa. 343, 356. In this connection, it is particularly important that the learned court below should not overlook the relevant rules of law and distinctions to be kept in mind when considering the case from the aspects of self-defense and manslaughter, respectively, as pointed out in Com. v. Colandro, supra; and, if the fact that the defendant had been accused of killing another man is again brought forward in the same way as at the last trial, the jury should be instructed as to the relevancy of the testimony upon that subject, and that inquiry concerning the matter is permitted only for the limited purpose of "ascertaining the opportunities, sources and extent of the knowledge of the respective witnesses on the point of the general reputation of the defendant, and not to show that defendant was probably guilty of the other offense": Com. v. Colandro, supra, p. 355.

It appears that Principatti's face is badly scarred on both sides, and that these ugly blemishes are plainly visible. Counsel for defendant, fearing that, through a misunderstanding as to the source of his client's disfigurement, the jury might become prejudiced against the latter, offered to show that this came about through no fault of his own. To enter upon such an investigation might lead to collateral issues that would seriously confuse a trial; hence, we cannot say error was committed in the refusal of the present offer.

The accused tendered in evidence an anonymous letter received by him on May 1, 1916, almost a year before the killing, which he claimed to be a "Black Hand" communication. We have read the epistle in question, and, considering its remoteness from the day of the crime and the lack of any evidence to connect the deceased therewith, we cannot say that its exclusion was error.

The fact that Principatti surrendered himself and gave up his pistol to an officer of the law within an hour after the shooting, was put in evidence; but the trial

judge did not err in refusing to permit the defendant to be interrogated, or in declining to let in other evidence concerning his self-serving declarations at that time.

There are twenty-nine assignments, covering more than thirty printed pages; we do not deem it necessary to refer specifically to each of these, but have sufficiently reviewed those of importance. Many of them, standing alone, do not show reversible error; but several do, and, together, they present a clear case of mistrial. Were the matters of complaint all of a minor character, we would be disinclined, considering the evidence against the accused, to set aside the present judgment; but so much harmful error is called to our attention that, if the right to due and lawful trial is to be maintained, we must reverse.

The defendant may not be able to substantiate his various offers of proof, or the jurors may disbelieve the testimony with reference thereto, if produced, or, if believed, they may not draw the inferences or conclusions therefrom that he contends for—in fact, they may entirely discredit his version of Amodeo's actions immediately before the shooting, as, possibly, the jurors did at the last trial; but, nevertheless, the defendant is entitled to have his testimony as to what took place on that occasion, together with the relevant evidence covered by the various offers which we have discussed, received and properly submitted to a jury for its deliberate consideration, particularly on the issue as to whether, at the time of the killing, he acted with malicious deliberation or under other mental influences which might operate either to relieve him from the charge of murder or reduce the offense to voluntary manslaughter.

Finally, since this case must be tried again, it may not be amiss to suggest that, when witnesses, by the action of their hands or otherwise, undertake to indicate time, space, distance or anything else, as several appear to have done at the last trial, counsel eliciting the evidence in question should be careful to have an intelligible ex-

planation placed upon the record, so that the testimony may be understood on review; otherwise, whenever the notes are not clear, we must give them the interpretation which supports the verdict: Donnelly v. Lehigh Nav. Elec. Co., 258 Pa. 580, 588-9, and other authorities there cited.

All assignments that show rulings or instructions conflicting with the views here expressed, together with the twenty-ninth, which complains of the sentence, are sustained. The judgment is reversed with a venire facias de novo.