**HAMMOND v. SQUIER, Warden.**

**No. 533.**

District Court, W. D. Washington, S. D.

Aug. 31, 1943.

228

William J. Madden, of Seattle, Wash., and Clifton A. Hix, of San Pedro, Cal., for petitioner.

J. Charles Dennis, U. S. Atty., and Harry Sager, Asst. U. S. Atty., both of Tacoma, Wash., for respondent.

LEAVY, District Judge.

The petitioner herein seeks his release by writ of habeas corpus from the United States Penitentiary at McNeil Island, Washington, where he is imprisoned by virtue of a sentence imposed upon him by a special military commission, which was convened on board the U. S. S. Argonne, in the South Pacific, on December 3, 1942.

The commission was convened upon the order of Admiral William F. Halsey, Commander, South Pacific Area and South Pacific Force. The order convening the commission was issued on November 29, 1942; the petitioner was tried before the commission so convened, upon three separate charges, to-wit:

Charge 1: "Disobeying the lawful order of his superior officer."

Charge 2: "Disrespectful in language to his superior officer, while in the execution of his office."

Charge 3: "Striking his superior officer, while in the execution of the duties of his office."

Charges 1 and 2 contain two specifications each, and Charge 3 contains a single specification. The commission found specification one, Charge 1, proved; specification two, Charge 1, not proved. In the 2nd Charge, it found specification one proved, and specification two not proved. In the Third Charge, it found the specification proved in part, and then it sentenced the petitioner to be confined for a period of five years, "and suffer all the other accessories of said sentence", as prescribed by Section 622, Naval Courts and Boards, and then it provided that the place of confinement was to be designated by the Secretary of the Navy.

Upon a review of the action of this commission by the Judge Advocate General of the Navy, W. B. Woodson, on the 19th of February, 1943, he recommended that the findings of the military commission be reversed as to Charges 1 and 2, and be affirmed as to Charge 3. He further recommended a reduction of the sentence from 5 years to 2 years, the maximum fixed by law covering offenses by merchant seamen (46 U.S.C.A. § 701), as provided by Act of Congress. This recommendation was submitted on February 20, 1943, to Admiral E. J. King, Commander in Chief, United States Fleet, and Chief of Naval Operations, who, in turn, submitted it to the Secretary of the Navy, with his recommendation that it be approved, specifically stating: "Forwarded, recommending approval of that portion of the sentence not in excess of legal limitations."

It should be noted that the "Articles for the Government of the Navy," 34 U.S.C.A. § 1200, Art. 4, 3rd Subdivision, provide specifically that the offense herein charged carries a maximum penalty of death upon conviction.

On February 24, 1943, the Honorable Frank Knox, Secretary of the Navy, approved the recommendation of the Judge Advocate General and Admiral King, and then directed that the petitioner be retained

in confinement at the United States Receiving Station, Naval Operating Base, San Diego, California, until such time as a federal prison or penitentiary was designated. Thereafter, on March 1, 1943, the petitioner was accepted for the service of his sentence by the Honorable James V. Bennett, Director, Bureau of Prisons, to serve such sentence at the United States Penitentiary, McNeil Island, Washington, and on March 5, 1943, the Secretary of the Navy designated such penitentiary as the place of confinement for said petitioner to serve the sentence which had been imposed upon him by the military commission.

On June 17, 1943, the petitioner filed his application for a writ of habeas corpus herein, alleging that he was being restrained of his liberty unlawfully, and that the tribunal which tried, convicted and sentenced him was without jurisdiction. This matter came on for hearing on a rule to show cause on the 13th day of August, 1943, and the parties were given an opportunity to submit authorities. An answer to the petition was filed by the respondent, admitting generally the allegations of the petition, except to deny that petitioner was tried by a Naval Court Martial, and then alleging affirmatively that the trial was held by a special military tribunal, towit, a military commission, and then further denying that such tribunal was without jurisdiction.

It is admitted by all parties to the record in this cause that the petitioner was a civilian seaman attached to a merchant vessel of the United States, operated by a private corporation for the War Shipping Administration; that the offense of which he was convicted occurred on board this vessel while it was in a zone of military operations and in an actual theater of war in the South Pacific. It was further admitted that the petitioner had not signed Articles of War, was not serving with the United States Navy, Marine Corps or Coast Guard, and was not employed by the government. The same facts are admitted as to the Chief Engineer, whom the petitioner is charged with having assaulted.

The question in this case is this: Upon the facts as made by the pleadings and proof herein, had the military commission, which was convened on the order of Admiral Halsey, jurisdiction legally to try and sentence the petitioner?

The formal Charge upon which the petitioner was tried, convicted and is now serving a sentence, reads as follows:

"Charge III

"Specification 1

"In that George Hammond, merchant seaman, attached to the S. S. Eli Whitney, a merchant ship of the United States operated by the Grace Lines for the War Shipping Administration, owner, while so serving on board the S. S. Eli Whitney as an oiler, did, on or about November 23, 1942, on the gangplank of said ship with a U. S. Navy cargo, in a zone of military operation and in an actual theater of war in the South Pacific Area, when ordered by one B. H. Hutchinson, Chief Engineer officer of said ship to remain on board said ship, wilfully, maliciously, and without justifiable cause, strike, to the detriment of the success of United States military operations, the said Hutchinson, who was then and there in the execution of the duties of his office, the United States then being in a state of war."

From the record as made, the following facts are found:

1. That the Port of Noumea, New Caledonia, was outside the territorial jurisdiction of continental United States.

2. That it was in a theater of active military operations against an enemy at the time.

3. That the vessel upon which the petitioner was employed as a seaman was not attached to, nor a part of the United States Navy, and that petitioner was not a member of the Naval Forces of the United States, nor employed by them.

4. That the Chief Engineer of the S. S. Eli Whitney was not a member of the Naval Forces of the United States nor employed in any way by them.

5. That the S. S. Eli Whitney had been in the Port of Noumea for a period of six weeks preceding the offense with which the petitioner was charged.

6. That the cargo of the S. S. Eli Whitney consisted of stores and materials for the military forces.

7. That the petitioner's presence on the S. S. Eli Whitney was neither essential nor required to make available the cargo or the ship itself to any of the military authorities.

8. That the petitioner bore a good reputation among his mates and with his superiors during his time of service as a seaman upon said vessel.

9. That the petitioner had no intent to interfere with military operations nor knowledge of the fact that his conduct

would be construed as an interference with the national war effort.

10. That the altercation which resulted in the petitioner's assaulting the Chief Engineer did not involve a violation of naval rules and regulations.

11. That the altercation between the petitioner and the Chief Engineer did not, in fact, interfere with any order, direction or command of the naval authorities in this theater of war.

12. That the cargo of the merchant vessel, S. S. Eli Whitney, was at all times following the altercation available to the naval authorities in this theater of war.

13. That the altercation was the outgrowth of a belief on the part of the petitioner, whether real or fancied, that he was being unfairly treated in the matter of shore leave by his superiors, and in a sudden fit of passion he struck the Chief Engineer, who was his superior civilian officer.

■ Based upon these facts, is there justification and warrant for a military trial such as we have here? If there is, then it would not be within the province of the civil courts to interfere; while on the other hand, if this special and extraordinary tribunal was brought into being without any basis in law or fact, then it becomes the plain duty of the civil courts to grant relief.

The matter is one of great moment in a period such as we are now experiencing, because no one can justify any interference with the successful conduct and prosecution of the war against our enemies, and equally important is the fact that constitutional rights and privileges of the citizen must not be usurped, disregarded or destroyed at any time.

■ The celebrated case of Ex parte Milligan, 4 Wall·2, 71 U.S. 2, 141, 18 L.Ed. 281, has been the beacon light and guide of the courts in passing upon a matter such as is presented in the instant case. A statement in the concurring opinion written by the distinguished Chief Justice of the Supreme Court at that time, Samuel P. Chase, is directly in point in a consideration of the principles of law applicable to this case: "There are under the Constitution three kinds of military jurisdiction: one to be exercised both in peace and war; another to be exercised in time of foreign war without the boundaries of the United States, or in time of rebellion and civil war within states or districts occupied by rebels treated as belligerents; and a third to be exercised in time of invasion or insurrection within the limits of the United States, or during rebellion within the limits of states maintaining adhesion to the National Government, when the public danger requires its exercise. The first of these may be called jurisdiction under Military Law, and is found in acts of Congress prescribing rules and articles of war, or otherwise providing for the government of the national forces; the second may be distinguished as Military Government, superseding, as far as may be deemed expedient, the local law, and exercised by the military commander under the direction of the President, with the express or implied sanction of Congress; while the third may be denominated Martial Law Proper, and is called into action by Congress, or temporarily, when the action of Congress cannot be invited, and in the case of justifying or excusing peril, by the President, in times of insurrection or invasion, or of civil or foreign war, within districts or localities where ordinary law no longer adequately secures public safety and private rights."

■ The proceedings in the instant case must fall under the second classification, i. e. Military Government, since it is conceded that neither Military Law nor Martial Law Proper, as above defined, prevailed in this territory, and the petitioner could not have been tried under either.

The Milligan case is frequently referred to in the now celebrated case of the German spies, which is reported as Ex parte Quirin et al., 317 U.S. 1, 63 S.Ct. 2, 11, 87 L.Ed. ——. This case does not modify or overrule the Milligan case, but it does deal expressly, as does the Milligan case, with the power to create a military commission and to try persons accused, who do not fall within the classes enumerated by Congressional Act, as being subject to military or naval court martial.

The Quirin case is extensively quoted and relied upon by the respondents herein. It has value insofar as it defines the term "Law of War". The facts themselves are not at all analogous to the facts in this case. The petitioners therein were all enemy belligerents and were in this country with the express intent and purpose of committing acts of violence and sabotage and lending aid and comfort to the enemy. The court therein stated: "For here Con-

gress has authorized trial of offenses against the law of war before such commissions. We are concerned only with the question whether it is within the constitutional power of the national government to place petitioners upon trial before a military commission for the offenses with which they are charged. We must therefore first inquire whether any of the acts charged is an offense against the law of war cognizable before a military tribunal, and if so whether the Constitution prohibits the trial."

There are many other cases cited by respondent, but they, almost without exception, fall within a class where the persons were civilians who are covered either by the "Articles of War", 10 U.S.C.A. §§ 1471–1593, or "Articles for the Government of the Navy", 34 U.S.C.A. § 1200, or by a declaration of martial law.

In this case we can not look to either the Articles of War or Articles for the Government of the Navy, or a declaration of martial law for jurisdiction, but must find it, if it exists, in the law of war, and the rule to be applied is announced in the Quirin case as follows: "We have no occasion now to define with meticulous care the ultimate boundaries of the jurisdiction of military tribunals to try persons according to the law of war. It is enough that petitioners here, upon the conceded facts, *were plainly within those boundaries,* and were held in good faith for trial by military commission, charged with being enemies who, with the purpose of destroying war materials and utilities, entered or after entry remained in our territory without uniform—an offense against the law of war. We hold only that those particular acts constitute an offense against the law of war which the Constitution authorizes to be tried by military commission." (Italics mine)

■ When we apply this test to the instant case, under the facts, we are limited to a determination of the question of whether the acts of the petitioner were of such a nature as to be "to the detriment of the success of the United States military operations", as alleged in the Charge placed against the petitioner. There is nothing in the whole record of this case that supports the quoted allegation. The Judge Advocate General of the Navy, himself, in reviewing this case, found; "The accused in this case was a civilian, not accustomed to military discipline, and the evidence was not suf-

ficient to convict him of disobeying the lawful order of a superior officer." And in passing upon specifications under Charge 2, he held: "The evidence in the case does not establish that the objectionable language was of itself 'to the detriment of the success of the United States military operations', as alleged. It does not, therefore, under the circumstances, constitute an offense triable by an exceptional military court."

It is difficult to understand how the same allegations, when used in Charge 3, based upon the same evidence, can be said to have been proven. This finding by the Judge Advocate General of the Navy is an admission that unless the conduct of the petitioner was "to the detriment of the success of the United States military operations", there would be no basis whatever for the creation of the special military commission which tried him, and that it would be without jurisdiction, and confinement under its sentence would be a denial of due process of law to the petitioner, as guaranteed by the Constitution of the United States.

Under facts as here presented, we must find that the military commission was without jurisdiction.

■ While the military commission so designated was in all respects a court organized as a naval court martial, and its proceedings were conducted in keeping with the rules governing such a tribunal, however, the imposition of sentence, as finally approved, was based solely upon the authority of law as found governing shipping, 46 U.S.C.A. § 701, and there is no contention made, nor any reason shown why the conduct of the petitioner herein could not have been dealt with under the provisions of the Acts of Congress governing offenses and punishments under the law of shipping.

On March 22, 1943, Congress enacted legislation greatly broadening the scope of naval authorities in time of war, and enlarging the jurisdiction of the Navy under the "Articles for the Government of the Navy". Public 12, 78th Congress, 1st Session, Chapter 18, 34 U.S.C.A. § 1201.

■■ It is not necessary here to pass upon the question as to whether the acts of the petitioner, if committed subsequent to the enactment of this legislation, would subject him to a trial by a tribunal such as was here created, but the enactment of this legislation does very clearly establish

the purpose and intent of Congress to meet the new problems that grow out of the Nation's war effort, and it likewise establishes the fact that the existence of a state of war of itself can not and must not be allowed to be made the basis of denying "due process of law" under the Constitution (Amend. 5) and Congressional Acts. The power of the military authorities is in no manner circumscribed in the trial and punishment of civilians in those instances which clearly fall under the "law of war", as established by the facts in the Quirin case supra.

I must find that we do not have here a case that would be governed by the law of war.

■ It is therefore ordered and adjudged that the return to the rule to show cause in this case is insufficient, and it is overruled. It is further ordered and adjudged that a writ of peremptory habeas corpus do forthwith issue from this court, directing the respondent, P. J. Squier, Warden, United States Penitentiary, McNeil Island, Washington, to have and produce the body of George Pickens Hammond before this court, in Tacoma, at the United States courthouse, on the 4th day of September, 1943, at 10:00 a. m., then to be released and discharged from confinement without day, unless good cause be on that date and time to the contrary shown to the court.