**PERLSTEIN v. UNITED STATES et al.**

**No. 177.**

District Court, M. D. Pennsylvania.

Oct. 2, 1944.

Jerome E. Parker, of Scranton, Pa., for petitioner.

Myron C. Cramer, Major General, U. S. Army, The Judge Advocate General, and Archibald King, Colonel, J.A.G.D., United States Army, both of Washington, D.C., Tom C. Clark, Asst. Atty. Gen., David Reich, Atty., Department of Justice, of Washington, D.C., and Herman F. Reich, Asst. U. S. Atty., of Lewisburg, Pa., for respondents.

WATSON, District Judge.

On the petition of Samuel Perlstein, to whom I shall refer as the "Petitioner," a rule was granted to show cause why he should not be released from the United States Penitentiary, Lewisburg, Pennsylvania, where he is presently confined by virtue of a sentence imposed by an Army General Court-Martial.

The Petitioner was employed as an assistant mechanical superintendent by Johnson, Drake & Piper, a civilian salvage company operating under a contract with the United States Government. He was hired in a contract of employment signed in New York City on June 15, 1942, and was then sent to Massawa, Eritrea, where he arrived August 21, 1942. Massawa is a harbor on the Red Sea. The contract provided that his employment might be terminated by the Army if his services were not satisfactory in the judgment of the Army Officer in Charge. If discharged, the Company was under obligation to pay his transportation and subsistence back to the United States. By a letter dated September 21, 1942, the commanding officer of the Eritrea Service Command, United States Army Force in the Middle East, ordered the Company to discharge the Petitioner. The order was obeyed and Petitioner prepared to leave Massawa by ship.

On September 26, 1942, Petitioner visited George Lindsey on board another ship in the harbor at Massawa before leaving, and it was at this time that the crimes of which he was later convicted were alleged to have taken place. He was convicted of larceny of some jewelry and of forgery of a receipt for the articles stolen, and also of uttering the forged instrument at Port Tewfik, Egypt.

On September 27, 1942, Petitioner sailed from Massawa on a ship bound for Port Tewfik, presumably on his way back to the United States. When he arrived at Port Tewfik on September 30, 1942, he was arrested by a British Port Constable. The American Vice-Consul took him in charge and removed him to Cairo on October 2, 1942. Petitioner was arrested and placed in jail October 22, 1942, and was brought before a General Court-Martial for trial at Heliopolis, Egypt, December 23, 1942, on the three separate charges mentioned above. He was found guilty as charged and sentenced December 29, 1942, to be confined at hard labor at such place as the reviewing authority might direct for a period of fifteen years, which was later reduced to ten years on the recommendation of the Staff Judge Advocate.

Petitioner seeks release from the penitentiary contending that the General Court-Martial was without jurisdiction to try and to sentence him.

Grounds for jurisdiction as set forth by the Court-Martial were that the Petitioner at the time of the commission of the offenses of which he had been convicted and at the time of his arrest, trial, and the approval of the sentence imposed upon him was a person "accompanying the Armies of the United States in the field in time' of war" and was at said times, therefore, subject to military law and to trial and sentence by Court-Martial pursuant to Article of War 2(d), 10 U.S.C.A. § 1473(d), which provides:

"Persons subject to military law (article 2). * * *

"(d) All retainers to the camp and all persons accompanying or serving with the Armies of the United States without the territorial jurisdiction of the United States, and in time of war all such retainers and persons accompanying or serving with the Armies of the United States in the field, both within and without the territorial jurisdiction of the United States, though not otherwise subject to these articles."

Petitioner contends that he was not a person "accompanying or serving with the Armies of the United States in the field" within the meaning of the Article of War 2(d).

Petitioner left the safety of the United States to become engaged in necessary maintenance and transportation work for the armed forces, namely, in salvage operations conducted for the purpose of clearing the port of Massawa of scuttled German and Italian ships and a floating dock. The Petitioner was apprised, by the contract he signed, that he would be sent either to the East or the Near East, both in the present conflict considered theaters of war at that time, and that he could be discharged for any reason whatsoever by the Army Officer in charge of the operations at which his company was laboring.

From the time the Petitioner left this country he became aligned with a military enterprise. The Petitioner was sent to Eritrea to aid in a military purpose and, when that purpose was ended, he was to be returned to the United States. When the

Petitioner came to Eritrea, it was a military base occupied by American and British forces as allies and was a "theater of operations" of the United States Army under the Eritrea Service Command. Massawa is in Eritrea, a colonial possession of the Kingdom of Italy in Italian East Africa on the continent of Africa. It is a port on the Red Sea from which a rail line leads to Asmara, the capital, a distance of about fifty miles. American military installations were also located in Asmara at the time. The United States was at war with Italy at the time, and Axis forces had just been pushed from the very gates of Alexandria in Egypt. The route up the Red Sea was then the only safe route to Egypt. The Mediterranean Sea was infested by the enemy. Allied arms had just passed their nadir. The particular job given to the salvage company was to refloat ships that had been scuttled in Massawa harbor to obtain for the Allies much needed shipping.

There are several cases which have upheld the jurisdiction of a Court-Martial over civilians in cases where the one charged has been in close physical proximity to bodies of armed forces. Though there are many details in which the cases resemble each other and the one at bar, there are other details which make them dissimilar. This case must be decided on its facts alone. In Re Di Bartolo, D.C., 50 F.Supp. 929, the controlling facts are quite similar to those in the case at bar and, in that case, the petition for a writ of Habeas Corpus was dismissed and the writ was dismissed.

Of the cases relied upon by the Petitioner but two are cases in which the writ of Habeas Corpus was allowed: Ex parte Weitz, D.C., 256 F. 58, and Hammond v. Squier, D.C., 51 F.Supp. 227. In Ex Parte Weitz, Petitioner was a civilian chauffeur employed by contractors at work at an army base in the United States. He negligently ran over and killed a soldier at the camp. Weitz was released from jurisdiction of a court-martial on application to the United States District Court for Habeas Corpus. The court held that: "Persons 'accompanying or serving with * * * armies in the field' are those who, though not enlisted, do work required in maintenance, supply, or transportation of an army." [256 F. 59]. Because Weitz was not employed in one of the three named activities but in construction, the court held him not to be subject to military law. That limita-

tion of the jurisdiction of courts-martial over accompanying civilians to those engaged in the three activities mentioned is difficult to construe out of the broad scope of Article of War 2(d). However, even if the test laid down by the court in the Weitz case is correct, the Petitioner in the case at bar being actively engaged in work connected with transportation would fall within the rule. In Hammond v. Squier, supra, a writ of Habeas Corpus was granted to a civilian seaman on a merchant ship, who had been sentenced by a military commission convened by the Navy, for having struck an officer of his ship while in the theater of war in the Pacific. This case, however, arose in the naval service and not in the army; and, at the time that the offense was committed, the Articles for the Government of the Navy, 34 U.S.C.A. § 1200, the naval counterpart of the army's Article of War, contained no provision making naval law applicable to civilians "accompanying" the navy, as Article of War 2(d) makes the military law of the army applicable to civilians accompanying the army. Hammond, however, was tried before a military commission on the theory that the offense was committed within the theater of war where the commanding officer's authority is supreme, and where he may try any one, even a civilian, for any offense there committed. It was not decided on the strength of the "accompanying" clause in Article of War 2(d).

It is my opinion that the reason for the revision of the Article of War was not to extend jurisdiction only over those crimes which had to be with army morale or the discipline of the administration of the army. The intention was to extend jurisdiction over those persons who, before the revision, were subject to no restrictions or laws because they were outside the territorial jurisdiction of the United States and also of the United States Army.

This interpretation would not endanger the liberties and rights of all United States civilians in countries in which there might be armed forces of the United States. Had the Petitioner been a hotel proprietor, a merchant, or a private businessman or resident, the military authorities could certainly not have had jurisdiction under the Articles of War.

■ Petitioner contends that this army was not "in the field"; that a situation of "Peace" existed in Eritrea at the time. As mentioned above, Massawa was on a vital

supply line to Egypt. It was, at the time, very close to the Axis in Egypt in terms of airplanes, sea raiders, and submarines, subject always to the possibility of Italian uprisings, since it was an occupied country. An army occupying Italy itself is certainly an army "in the field," and the army which was occupying Eritrea, one of Italy's colonies, was certainly an army in the field.

There is a further contention that the record does not show that there was any kind of, or definite number of, United States Army units stationed at the sites in question. There is nothing in article 2(d) which designates that the accused must have been within sight of, or within a certain distance from, a definite number or group of the armed forces to fall within the "accompanying" clause. It is quite possible for a civilian attached to a very small patrol of soldiers in strange territory to commit an act subjecting him to court martial, and, at the same time, a civilian might live immediately outside a huge army encampment without being subject to the jurisdiction of the army at all. It is difficult, if not impossible, to see how the number of military men, or the distance from the army installation, is to be set up as the index of the word "accompany."

Petitioner strongly urges that he was a civilian in every sense and in every capacity. I agree that he was such. The mere fact of employment by Johnson, Drake & Piper did not make Petitioner a follower of the Army, but his employment by them in an occupied country on a vitally important military project does alter the situation.

■ My conclusion is that the Petitioner must be considered to have been accompanying the Army of the United States in the field in time of war.

■ Petitioner also contends that, even were the Court to assume that the Petitioner was within the 2nd Article of War, subd. (d), his discharge from the service prior to the date of the alleged commission of the crimes would withdraw him from such jurisdiction just as a soldier is withdrawn when he is discharged from service. This argument contains no merit whatsoever because military jurisdiction expires when "accompaniment" ceases, and it by no means follows that accompaniment ceased in this case simply because Petitioner's employment ceased. Though relieved of his position Petitioner was none

the less still accompanying the military project which was the reason for his presence in Eritrea.

Physically Petitioner was just as near to the armies of the United States at the time of the crime as he was when in the contractor's employ. Administratively and legally he had not been merged in the population of Eritrea; but, as is shown by the papers in reference, he is a citizen of the United States brought to Eritrea for a limited time by a contractor with the United States Army to work on a project of the United States Army upon an express agreement with him that he would be returned by the contractor to the United States upon completion of such employment, and he was at the time awaiting opportunity to return.

From the facts here the conclusion is inescapable that Petitioner's "accompaniment" continued while he was still in Africa, totally independent of the fact of his removal from his job.

■ This Court is aware that jurisdiction over the Petitioner cannot be claimed merely on the basis of convenience, necessity, or the non-availability of civil courts. Likewise, jurisdiction cannot be derived from the understanding reached between the American and British Commanders exempting all persons subject to the military law of the United States from the jurisdiction of the Courts established or reconstituted by the British military government. Although such an understanding might have afforded the American military the opportunity to exercise jurisdiction which has its legal source elsewhere, it could not confer jurisdiction. Military jurisdiction over the Petitioner must rest upon the valid acts of Congress.

■ Petitioner also contends that the General Court-Martial of the United States Army did not have any legal status to convene and try him in Heliopolis, Egypt, at the time in question. It is my earnest opinion that once jurisdiction attached, it having been shown that Petitioner "accompanied" the armed forces, the location of the Court-Martial is not material. Were conditions such that a court-martial could not be held in a foreign country, can it possibly be held that on removal to the United States, the Army would no longer have jurisdiction over the person charged merely because he had been removed to the United States where originally the Court-Martial

would not have had jurisdiction? The answer to that question answers the one at bar. Once jurisdiction attached, the scene of the trial was not material so long as no prejudice to or change in the rights of the Petitioner resulted.

I feel that I must hold that, under the facts and circumstances in this case, the General Court-Martial convened to try the Petitioner had jurisdiction over the person of the Petitioner and over the offenses with which he was charged, and, therefore, the prayer of the Petitioner should be denied.

The rule to show cause is discharged, and the petition is dismissed.