Commonwealth *v.* Thompson, Appellant.

Argued April 25, 1957. Before JONES, C. J., BELL, CHIDSEY, MUSMANNO, ARNOLD and JONES, JJ.

Judgment and sentence affirmed.

*Franklin E. Conflenti,* with him *Ezra C. Stiles, Jr.,* for appellant.

*Samuel Strauss,* Assistant District Attorney, with him *Edward C. Boyle,* District Attorney, for appellee.

OPINION BY MR. JUSTICE BENJAMIN R. JONES, June 6, 1957:

The defendant, having been found guilty of murder in the first degree with the death penalty affixed and having been sentenced to death, appeals from the refusal of the Court below to grant him a new trial.

Wallace Russell died as a result of wounds received in a shooting which took place on September 13, 1949 in a drinking place known as the Barbary Coast Club in Pittsburgh. The defendant, charged with having shot Russell, was indicted for murder and manslaughter in connection with his death. After a trial by jury, in January, 1950 defendant was found guilty of murder in the first degree with the death penalty affixed and sentenced to death. This conviction was upheld by this Court in a unanimous opinion (*Com. v. Thompson,* 367 Pa. 102, 79 A. 2d 401) ; a petition for reargu-

ment was refused and the U. S. Supreme Court denied certiorari (*Thompson v. Commonwealth,* 342 U. S. 835, 96 L. Ed. 631, 72 S. Ct. 58).

Then ensued a long series of legal proceedings which resulted eventually in a new trial for the defendant.[1]

The defendant was retried and, at this new trial, the jury returned a verdict finding the defendant guilty of murder in the first degree, with the death penalty attached. A motion for a new trial having been refused by the court en banc the defendant was sentenced to death. From that judgment of sentence this appeal was taken.

---

[1] A writ of habeas corpus was denied by the Common Pleas Court of Allegheny County and by this Court and the U. S. Supreme Court denied certiorari (*Thompson v. Pennsylvania,* 342 U. S. 929, 96 L. Ed. 692, 72 S. Ct. 370). On the ground that defendant's previous counsel had not properly conducted a pretrial investigation and had inadequately represented defendant at the trial, a request was made to the U. S. District Court (West. Dist. Pa.), but denied (*United States ex rel. Thompson v. Dye,* 103 F. Supp. 776) ; this ruling was upheld on appeal (*Same Caption* (C.C.A. 3rd Cir.), 203 F. 2d 429) and certiorari denied by the U. S. Supreme Court (*Thompson v. Dye, Warden,* 345 U. S. 960, 97 L. Ed. 1380, 73 S. Ct. 946). This court denied another petition for a writ of habeas corpus (unreported) and the U. S. Supreme Court denied certiorari and a stay of execution, Mr. Justice BURTON stating: "Upon examination of this petition, the record of the Supreme Court of Pennsylvania and the proposed petition for writ of certiorari, I find no substantial basis for granting the stay of execution and it is accordingly denied." Upon the ground that the prosecuting officers had suppressed material evidence at trial, another writ of habeas corpus was presented to the U. S. District Court (West. Dist. Pa.) and denied (*United States ex rel. Thompson v. Dye,* 113 F. Supp. 807) ; on appeal, the matter was remanded to the District Court for additional findings of fact (*Same Caption,* 208 F. 2d 565). After hearing, the District Court made certain findings of fact and denied the writ (*Same Caption,* 123 F. Supp. 759). On appeal, the writ was granted without prejudice to the Commonwealth of Pennsylvania to retry the defendant (*Same Caption,* 221 F. 2d 763).

At approximately seven o'clock on the evening of September 13, 1949, the defendant entered a drinking place located at 20 Townsend Street, Pittsburgh, known as the Barbary Coast Club. Previously on the same day the defendant had been in this club, after sometime he left there and, when he returned, he had in his possession a .45 caliber Colt revolver. When the defendant returned there were present, among others, one Aaron Daniels, a patron, and one Wallace Russell, the bartender. Russell and Daniels had been engaged in a conversation and Daniels was turning from the bar to leave the place when he was shot through the left arm by the defendant and then Russell was shot by defendant according to the Commonwealth's version which was denied by the defendant. There was *some* testimony that before any shot was fired, the defendant said "This is a stick-up, don't nobody move." There was also *some* testimony that the bartender said "Don't kill me, if you want the money take the money. Don't kill me", that the bartender raised his hands in the air from behind the bar and that the defendant shot him through the abdomen, inflicting wounds from which Russell died. There was also *some* testimony that the defendant had reached into the bartender's pocket and *some* testimony that defendant had gone behind the bar to the cash register and that, when backing toward the door to make an exit from the place, the defendant said "Nobody move, if you do, I will kill you." Five witnesses testified on behalf of the Commonwealth to the events surrounding the shooting.

At the second trial, the defendant did not testify. However, the Commonwealth offered in evidence a statement made to the police by defendant the day following the shooting, and defendant's testimony at the first trial and at the habeas corpus proceedings. Ac-

cording to defendant's statement to the police he went to the Barbary Coast Club at approximately two o'clock in the afternoon; after some time there, he got into an altercation about dancing with a woman with the reputed owner, one Johnny Taylor; according to the defendant, Taylor kicked him while Russell held a gun on him and defendant was forced to leave the premises; the defendant stated that he then went to his home to get his gun, at first stating that he got the gun and went back to kill somebody because somebody had kicked him and later stating that he secured the gun not to kill anyone but to talk it over with Johnny Taylor. Defendant stated that he returned to the Barbary Coast hoping to talk it over, that he remembered firing only one shot: "Q. How many shots did you fire from this revolver? A. I don't remember but firing one. Q. And who did you fire that at? A. The fellow that I killed." He stated that he then left. According to defendant's testimony at the first trial, defendant went to the Barbary Coast Club at approximately three o'clock in the afternoon, saw one Susie Horton there and got into an altercation with Johnny Taylor about dancing with the Horton woman; Taylor threatened to evict him; defendant started to back toward the door, Johnny Taylor kicked him and he saw a gun pointing at him; at that time the defendant stated he had drunk four pints of moonshine and had been smoking marihuana; defendant stated that he went home, secured his gun and returned to find out why he was kicked out of the Barbary Coast; upon his return, he saw a man (apparently Daniels) lying on a table; that the bartender, Russell, started after him with a gun in his hand and that if he, the defendant fired his gun, he had no recollection of the incident; he denied he said anything about a stick-up or that he tried to take any money from any person. At the habeas corpus pro-

ceedings the defendant testified that, after he was thrown out of the Barbary Coast, he did not leave the premises but went downstairs and there met one Oscar Carey who gave him a gun; that he went upstairs with the gun and the bartender ran toward him with a gun and grabbed him by the collar; he did not admit firing any shot but he did admit that he told some friends later that he had "shot somebody" and that he had been drinking.

It is highly significant that one of defendant's own witnesses, upon cross-examination, testified that shortly after the shooting the defendant came to her home and that, after he had left her home, she saw on the stairs a wallet in which was the social security card of the deceased Russell. Oscar Carey, a rebuttal witness for the Commonwealth, testified that the gun had been taken by the defendant from Carey's home shortly before the shooting, without Carey's knowledge; he denied that he had given the gun to the defendant in the downstairs area of the Barbary Coast Club and he testified that he was present when the defendant dropped the wallet in which he found not only the deceased's social security card, but also a numbers slip and six dollars. The defendant, in neither his statement nor his testimony at the previous proceedings, denies that he fired a shot and the testimony of several witnesses who saw and talked with him after the shooting is to the effect that defendant acknowledged having shot someone. Although the defendant testified that he was rushed or attacked by the bartender, he at no time stated that by such tactics he was ever put in fear or in terror or that when he fired the shot he was acting under the compulsion of any fear.

The Commonwealth proceeded upon two theories: (1) that the killing of Russell took place during the commission of a robbery and, (2) even if that had not

been established, the killing was accomplished wilfully, deliberately and with premeditation. The principal defense [2] was that when the defendant returned to the Barbary Coast, he was attacked by Russell, who then had a gun in his hand, and that, if the defendant did shoot, it was an act of self-defense.

On this appeal, the defendant urges that the Court below erred in three respects: (1) that the Court erred in its instructions to the jury relative to the law of self-defense and voluntary manslaughter; (2) that the Court erred in permitting the reception into evidence of a court-martial record of the defendant to assist the jury in determining the appropriate penalty in the event that defendant was found guilty of murder in the first degree; (3) that the Court erred in proceeding to trial without having disposed of a writ of habeas corpus mailed to the Court by the defendant.

The defendant urges that the Court erred in its charge: that the jury should have been instructed that, although it might conclude that the defendant had not established self-defense by a fair preponderance of the evidence, yet it may and should consider the evidence offered in support of self-defense in determining whether the defendant was guilty of voluntary manslaughter because of having acted under an uncontrollable fear of death or serious bodily harm, even though such fear might have been unreasonable. Stated in another manner: should the Court have instructed the jury that "where self-defense is not properly made out, the jury may consider that the defendant acted under uncontrollable fear of death or serious bodily harm, *even though the fear was an unreasonable one*": *Com. v. Banks*, 376 Pa. 531, 534, 103 A. 2d 726.

---

[2] There was also reliance on the fact that defendant had been drinking and smoking marihuana.

The defendant relies upon *Com. v. Colandro,* 231 Pa. 343, 352, 80 A. 571, wherein we stated: "While the evidence might not have been sufficient to satisfy the jury that the plea of self-defense had been sustained, it might have appealed to them as sufficient to negative or to throw such a doubt upon the element of malice as to reduce the crime to manslaughter. Therefore, in addition to the instruction on the law of self-defense, the jury should have been told, if they found that at the time of the shooting the defendant was not actuated by malice, but that he acted under the influence of an uncontrollable mortal fear raised by the threats and conduct of Rocco, and if they thought that the immediate circumstances, though adequate to raise the fear, were not sufficient reasonably to justify a belief on the part of the defendant that he was in immediate danger of death or great bodily harm, the grade of the crime would not rise higher than manslaughter." This language must be read in context with the factual situation in the *Colandro* case. In that case, there was testimony that for three months prior to the shooting the deceased had demanded money of the defendant, that deceased produced a revolver and threatened to kill defendant unless his demands were complied with, that deceased's threats continued until the afternoon of the day of the shooting, that deceased sent a messenger to defendant conveying similar threats and at the time of the shooting when the deceased entered the room, he repeated his threats, started to shoot and the defendant was placed in fear. In the *Colandro* case, the Court instructed the jury that there was only "one issue"—self-defense—, that the possibility of manslaughter was not present and that it was necessary for the defendant to satisfy the jury that his version of the shooting was correct.

*Com. v. Principatti*, 260 Pa. 587, 104 A. 53, which applied the rule of the *Colandro* case, also is unlike the instant case: approximately 9 days prior to the shooting, deceased told defendant he was a member of the "Black Hand" assigned to kill defendant for having killed a member of that organization and that the matter could be fixed up for two hundred dollars; that the defendant believed that which deceased told him; when deceased was found, he had a stiletto, 3 loaded cartridges and a razor on his person and there was testimony that defendant knew deceased's dangerous reputation and feared him. This Court held it was error to exclude proof of deceased's threats to defendant and in refusing to permit defendant to show that when he saw the revolver in deceased's hands, he was thrown into such a passion of terror, as a result of the previous uttered threats, that he killed deceased while under the influence of such terror. In the *Principatti* case we noted that evidence that, just before the shooting, deceased turned toward defendant drawing a revolver which defendant saw in deceased's hands "would not be sufficient to show a provocation which would justify killing in self-defense, or even such a passion of fear as to reduce the alleged crime to manslaughter" (pp. 596, 597) : a factual situation very similar to the factual situation herein related by defendant.

Other decisions of this Court which have applied the *Colandro* rule also presented dissimilar situations: *Com. v. Miller*, 313 Pa. 567, 170 A. 128 in which the Court, although it left to the jury the right to return a verdict of voluntary manslaughter, stated that defendant was either guilty of murder or nothing and that a verdict of manslaughter could not be supported by the facts; *Com. v. Flax*, 331 Pa. 145, 200 A. 632, in which the Court withdrew from the jury consideration of manslaughter and in which there was positive tes-

timony that defendant was acting in fear; *Com. v. Broeckey*, 364 Pa. 368, 372, 373, 72 A. 2d 134 in which defendant's plea for acquittal was based on self-defense, the Court failed to distinguish between voluntary manslaughter and self-defense and the "charge of the court precluded a verdict of not guilty"; *Com. v. Banks*, supra, in which the Court, although leaving manslaughter to the jury, stated that there was no evidence to sustain a verdict of voluntary manslaughter—this despite the fact that there was positive testimony that the defendant was "scared" by the deceased's actions and "by being scared" defendant's gun went off.

In *Com. v. Cargill*, 357 Pa. 510, 55 A. 373 the facts were somewhat similar to the case at bar. In that case, deceased operated a gambling house in which defendant had lost heavily two days prior to the shooting; the defendant went to the gambling house and, while discussing with deceased the money which he had lost, the deceased suddenly jumped up from his chair with his hand on his gun; defendant began shooting because he knew that deceased had a gun and feared him because of his bad reputation; the defense was self-defense. We there upheld a charge much more general on the subject of voluntary manslaughter than the charge herein examined.

The Court below in this case instructed the jury, inter alia, as follows: "The other grade of the crime to which we have referred is voluntary manslaughter. Manslaughter is the killing of a person without malice. It is committed when the death is intentionally brought about, but brought about under the influence of passion. As here used, the term 'passion' includes both anger and *terror*, provided they reach a degree of intensity sufficient to obscure temporarily the reason of the person affected, namely any of the emotions of the mind known as anger, rage, *fear*, sudden resentment

or *terror,* rendering the mind incapable of cool reflection. Therefore, to reduce an intentional blow, shot, stroke or wounding resulting in death, to voluntary manslaughter, there must be a sufficient cause of provocation and a state of rage or passion, without time to cool, placing the prisoner beyond the control of his reason and suddenly impelling him to the deed." (Emphasis supplied)

. . .

"Now, on the other hand, in order to reduce it below murder in the second degree, there must be evidence showing that the act was committed under the influence of passion, depriving the person acting in committing the crime of the ability to control himself, temporarily obscuring his reason".

After noting that defendant's counsel in his summation to the jury had stated that defendant was acting in self-defense the Court below charged completely and fully on the subject of self-defense. Of that instruction, the defendant makes no complaint.

In concluding his charge, the trial judge said to the jury: "Fourth, was the killing committed in the heat of passion, as described heretofore in the charge? If you find that it was, as a fact, you would then be justified in returning a verdict of guilty of voluntary manslaughter. Or, fifth, did the defendant act in self-defense, as that term has been described to you? If you find that he did, as a fact, you would then be justified in returning a verdict of not guilty."

At the conclusion of the charge when asked by the Court whether any further instructions were requested, defendant's counsel made no request. No exception, general or special, was taken to the charge and no objection thereto raised by defendant's counsel. It would appear that at the time counsel were satisfied with the instructions.

The instructions must be read in their entirety and with relation to the evidence which was presented. In *Com. v. Almeida,* 362 Pa. 596, 600, 68 A. 2d 595, we stated: "There is no rule more firmly established in law than that which was reiterated in Commonwealth v. Thompson, 321 Pa. 327, 330, 184 A. 97, to wit: 'The charge must be read as a whole, and excerpts therefrom must be read in relation to the context. It cannot properly be separated into parts and these treated piecemeal. . . . (citing cases). In Harman et ux. v. Chambers, 358 Pa. 516, 519, 57 A. 2d 842, Mr. Justice JONES speaking for this Court said: 'In scrutinizing a trial court's instructions to the jury for possible error, the charge must be read and considered as a whole.' "

An examination of the present charge in its entirety is convincing that the jury were well, properly and adequately instructed both on self-defense and voluntary manslaughter. The Court informed the jury that when a killing takes place, without malice but intentionally, but brought about by passion, including fear and terror, such a killing would be voluntary manslaughter. At no place in the charge nor in any manner whatsoever did the Court even intimate to the jury that they could not find the defendant guilty of voluntary manslaughter. A trial court is not required to use any particular language in instructing a jury provided that the language employed adequately and fully conveys to the jury the law applicable to the facts in the case. The Court below fully instructed the jury and a reading of the entire charge is persuasive of the conclusion that the jury fully understood that if they believed the defendant shot Russell under the sway, compulsion and influence of fear or terror, however unreasonable it may have been, they could find the defendant guilty of voluntary manslaughter.

An analysis of the evidence produced at this trial fails to reveal a single instance where the defendant, expressly or impliedly, indicates that he was placed in any fear or terror or that he shot Russell while under the influence of such fear or terror. While defendant urges that the Court should have charged in the language of the *Colandro* case, supra, he fails to point to any evidence which would have justified the language of such a charge. There is no duty on a trial judge to charge and instruct a jury upon law which has no applicability to the presented facts: there must be some relationship between the law upon which an instruction is required and the evidence presented at the trial. For instance, a court is not required to instruct on the law applicable to an alibi, if the record fails to reveal any evidence upon which alibi may be premised. However, despite the lack of any evidence in this respect, the court below in the exercise of an abundance of caution fully and adequately instructed the jury on voluntary manslaughter and its possibility as a verdict. Evidently even defendant's counsel before the verdict were satisfied with the Court's charge because they failed either to request additional instructions or to except to the instructions as given. The words of the late Chief Justice MAXEY in *Com. v. Barnak,* 357 Pa. 391, 419, 54 A. 2d 865 are particularly apposite: "Taking an appeal in criminal cases is not a game in which the appellant wins if he can show the trial judge fell a few degrees short of perfection in the conduct of his trial."

We find no error of commission or omission in the instructions of the Court below.

Defendant's second assignment of error relates to the admission in evidence of the record of prior convictions of defendant. First, the Commonwealth offered in evidence a record of the Allegheny County

Court indicating that defendant, under the alias of Robert Patterson, had been convicted of felonious assault and sentenced to the Allegheny County Work House for a term of 6 to 18 months; to this offer no objection was made and, apparently, the admission of this particular record is not assigned as error. Second, the Commonwealth offered in evidence the record of a general court-martial dated May 23, 1943, convened at Whittington Barracks, Lichfield, Staffordshire, England wherein the defendant was Cleveland Thompson, the present defendant: at that court-martial Cleveland Thompson was charged with violating the 93rd Article of War in three specifications. The first specification charged defendant with having committed an assault, with the intent to commit a felony, namely murder, by shooting Private Albert Johnson in the shoulder with a rifle; the second specification charged defendant with having committed an assault, with intent to do bodily harm, by shooting Private Wilbur Adkins in the foot with a rifle; the third specification charged defendant with having committed an assault, with intent to do bodily harm, by shooting Private John Camp in the buttocks with a rifle; all three assaults were alleged to have taken place at Whittington Barracks on November 27, 1942. The record, properly authenticated, indicates that defendant entered a plea of guilty to the first specification and pleas of not guilty to the second and third specifications; the findings on all three specifications and the charge were guilty and the defendant was sentenced to the Disciplinary Training Center No. 1, Shepton Mallet, Somerset, England. The objection to the admission of this court-martial record was based on the ground that such a record lacked judicial authority and finality and was not to be considered a prior conviction by a court recognized as a judicial tribunal.

By this assignment of error two separate questions are presented: (1) whether *any* record of a prior conviction should be permitted in evidence in a homicide trial? and (2) even if records of prior convictions are generally admissible in evidence, was this court-martial record within the class of admissible records?

Prior to the Act of 1925,[3] neither a court nor a jury had any discretion in fixing the penalty for murder in the first degree (*Com. v. Bishop*, 285 Pa. 49, 59, 131 A. 657) and a verdict of murder in the first degree automatically carried with it the penalty of death. (*Com. v. Madaffer*, 291 Pa. 270, 275, 139 A. 875).

The Act of 1925, supra, placed in the jury the right to fix the penalty, after a verdict of murder in the first degree, either at life imprisonment or death. With the advent of that Act of Assembly, a new concept concerning the admission of records of prior convictions against a defendant in a homicide case was enunciated in *Com. v. Parker*, 294 Pa. 144, 152, 153, 143 A. 904. The late Mr. Chief Justice VON MOSCHZISKER speaking for this Court, stated: "Therefore, under such acts [those empowering a jury in its discretion to choose for the defendant a sentence of either death or life imprisonment], it should not necessarily be accounted reversible error if the trial judge, in the exercise of his discretion, allows the jury the same sort of information that a judge considers when deciding as to punishment for crime." Further, the Court said (pp. 154, 155) : "While, under the Act of 1925, the jury are supposed to determine the degree of defendant's guilt before assessing the punishment (Com. v. Curry, 287 Pa. 553, 558), yet the act requires both the question of guilt and the punishment to be covered by one verdict.

---

[3] P. L. 759, 18 PS §2222, now part of The Penal Code of 1939, 18 PS §4701.

It may be that, if under any circumstances evidence of other offenses than the one on trial is admitted as helpful to the jury in the performance of its duty in assessing the punishment, such proof will inevitably be used by it in determining the guilt of the prisoner. This is not an insurmountable objection. . . . The Act of 1925 was not passed to help habitual criminals, and we take judicial knowledge of the fact that offenders of that designation have become so general that the law, not only lex scripta, but non scripta, must advance to protect society against them. This being so, in a case like the present, where the trial judge was convinced from the confessions of the defendants, as the Court below evidently was, that they were habitual offenders against society,—robbers, burglars, and, as occasion arose, murderers,—where the evidence indicated such to be their general manner of life, and where the defendants asked that, if convicted, the jury, in assessing punishment, extend mercy to them, we cannot say it was reversible error to receive their full confessions in evidence, even though it is possible that the admissions therein of other offenses may have militated in a general way against defendants." The *Parker* rule, without limitation, was followed in *Com. v. Mellor,* 294 Pa. 339, 144 A. 534; *Com. v. Schroeder,* 302 Pa. 1, 152 A. 835; *Com. v. Dague,* 302 Pa. 13, 152 A. 839; *Com. v. Flood,* 302 Pa. 190, 153 A. 152 and *Com. v. Nafus,* 303 Pa. 418, 154 A. 485.

In *Com. v. Williams,* 307 Pa. 134, 152, 160 A. 602, this Court, following the *Parker* rule, stated ". . . evidence as to prior convictions to aggravate the penalty must be strictly limited . . . Where the trial judge is convinced that such crime was committed for profit, such as the crimes of highway robbery, burglary, murder for life insurance, bank holdups, and the like, and that the criminals are habitual offenders against so-

ciety, then prior convictions may properly be received by the jury as an aid in determining the penalty to be inflicted. . . . It is also possible that there are other kinds of homicide where death is the result of sordid passion, which ought to be followed by the death penalty, where prior convictions could be used. But in no case should a record of such criminal acts such as pickpocketry, adultery, embezzling, perjury, or others of a similar nature be used in aggravation of the penalty."

· For almost three decades in Pennsylvania it has been a well established and recognized rule of law that evidence of prior offenses committed by the defendant, whether proven by records of prior convictions, by written or oral statements made by the defendant or elicited upon cross-examination of the defendant, is admissible in a homicide trial. The admissibility of such evidence is not for the purpose of enabling the jury to consider such evidence in determining the guilt or the innocence of the defendant, but *solely* for the purpose of enabling the jury, *after* a defendant has been found guilty of murder in the first degree, to decide what penalty should be imposed on the defendant. Being admissible *solely* to aid the jury in its determination of the penalty to be imposed and whether the defendant is entitled to mercy, its limitation of use must be *carefully* and *specifically* emphasized by the trial judge in his instructions to the jury.[4] *Com. v. Lehman*, 309 Pa. 486, 164 A. 522; *Com. v. Kurutz*, 312 Pa. 343, 168 A. 28; *Com. v. Stabinsky*, 313 Pa. 231, 169 A. 439; *Com. v. Harris*, 314 Pa. 81, 171 A. 279; *Com. v. Thompson*, 321 Pa. 327, 184 A. 97; *Com. v. Clark*, 322 Pa. 321, 185 A. 764; *Com. v. Rose*, 327 Pa. 220,

[4] A reconsideration of this rule was urged and rejected in *Com. v. Harris*, 314 Pa., supra, p. 82.

193 A. 17; *Com. v. Hawk,* 328 Pa. 417, 196 A. 5; *Com. v. Stelma,* 327 Pa. 317, 192 A. 906; *Com. v. Hipple,* 333 Pa. 33, 3 A. 2d 353; *Com. v. Petrillo,* 341 Pa. 209, 19 A. 2d 288; *Com. v. Childers,* 346 Pa. 258, 29 A. 2d 471; *Com. v. Johnson,* 348 Pa. 349, 35 A. 2d 312; *Com. v. Jones,* 355 Pa. 594, 50 A. 2d 342; *Com. v. Holley,* 358 Pa. 296, 56 A. 2d 546; *Com. v. Simmons,* 361 Pa. 391, 65 A. 2d 353; *Com. v. DePofi,* 362 Pa. 229, 66 A. 2d 649; *Com. v. Niemi,* 365 Pa. 105, 73 A. 2d 713; *Com. v. Johnson,* 368 Pa. 139, 81 A. 2d 569; *Com. v. Turner,* 371 Pa. 417, 88 A. 2d 915; *Com. v. Johnson,* 372 Pa. 266, 93 A. 2d 691; *Com. v. Lowry,* 374 Pa. 594, 98 A. 2d 733; *Com. v. Burdell,* 380 Pa. 43, 110 A. 2d 193; *Com. v. Cannon,* 386 Pa. 62, 123 A. 2d 675.

Under the application of this rule, a defendant may offer evidence of a mental weakness, falling short of legal insanity, to enable the jury to fix the penalty (*Com. v. Stabinsky,* supra; *Com. v. Hawk,* supra); records of prior convictions are admissible even though defendant's sentence was suspended and he was placed on probation (*Com. v. Simmons,* supra), or even pardoned (*Com. v. Cannon,* supra); records of a prior conviction in a foreign jurisdiction are admissible (*Com. v. Holley,* supra), but proof simply of arrests is not admissible (*Com. v. Johnson,* supra; *Com. v. Turner,* supra).

From *Com. v. Williams,* supra, through *Com. v. Petrillo,* supra, we limited the record of prior convictions and offenses to those involving habitual offenders, professional criminals or to murders of a cold blooded or atrocious nature. However, in *Com. v. Cannon,* supra, where the error alleged was the admission of a record of a prior conviction of crime neither of a sordid nor atrocious nature nor of the professional or criminal type, we said: "Neither reason nor authority limit the admissibility of prior convictions to cases where the

defendant was either a professional criminal or his crime one of sordid passion." [5]

In *Com. v. Lowry,* supra, Mr. Justice BELL, speaking for this Court, stated: "While many Judges, including the writer of this opinion, believe that a record or prior crimes should not be admissible even under the theory of aiding the jury in fixing the penalty as permitted by the Act of May 14, 1925, P.L. 759 and its successor, The Penal Code of 1939, supra, this Court has repeatedly held such records to be admissible for the limited purpose of aiding the jury in determining the penalty if they find the defendant guilty of murder in the first degree . . ."

If the court-martial record of the defendant is not otherwise objectionable, it was properly admitted in evidence in the instant case to enable the jury to fix the penalty, in the event the jury found the defendant guilty of murder in the first degree.

When this matter was previously before this Court, the late Mr. Justice LADNER, speaking for the court (*Com. v. Thompson,* 367 Pa., supra, 116, 117), stated: "Finally it is urged that the trial court erred in permitting the penalties imposed upon defendant after his conviction of felonious assault and sentences imposed thereon be read to the jury. We cannot see that the admission of the penalty along with the conviction, all of which was part of the same record, did the defendant any harm, especially as the record was that of a court-martial where the sentence following the conviction must be approved by the commanding officer and such sentence and approval are all part of one document." The defendant now urges that at that time

---

[5] The cases relied upon by defendant did not support the dictum which was sometimes found therein which would limit the admissibility of prior convictions to cases wherein the defendant was a professional criminal or the crime one of sordid nature.

only the admissibility of the penalty attached to the conviction, not the conviction itself, was raised; however it is evident that at that time this Court approved the admission of both the conviction and the penalty into evidence.

"A court-martial is a military or naval tribunal . . . having special and limited jurisdiction both in time of peace and war over offenses against the laws of the service, military or naval, in which the offender is engaged"; 6 C.J.S. §51, p. 440.  While courts-martial are not part of the judicial power of the U. S. and not included in the judicial part of the government (*Kinsella v. Krueger,* 351 U. S. 470, 76 S. Ct. 886, 100 L. Ed. 1342) the authority for their creation by the Congress arises under Article I, Sec. 8 of the Constitution (*Wade v. Hunter,* 72 F. Supp. 755; *U. S. ex rel. Creary v. Weeks,* 259 U. S. 336, 42 S. Ct. 509, 66 L. Ed. 973).

When within the territory of another government courts-martial may exercise jurisdiction over all persons and offenses subject thereto, wherever the army may happen to be at the time (*Perlstein v. Hiatt,* 57 F. Supp. 123 Aff'd. 151 F. 2d 167, cert. den. 327 U. S. 777, 90 L. Ed. 1005, 66 S. Ct. 956).

The decisions of courts-martial are not reviewable by the civil courts except to determine whether a court-martial had jurisdiction or whether it exceeded its powers; the guilt or innocence of the defendants cannot be inquired into (*Hunter v. Wade,* 169 F. 2d 973, 9 A.L.R. 2d 277).  A judgment of a court-martial is not subject to a direct review by a civil court (*Yamashita v. Styer,* 327 U. S. 1, 90 L. Ed. 499, 66 S. Ct. 340), although it may be open to collateral attack on limited grounds, i.e. whether it had jurisdiction over the offense and the person and whether the sentence was one authorized by law (*Collins v. McDonald,* 258 U. S. 416, 66 L. Ed. 692, 42 S. Ct. 326; *Hiatt v. Brown,* 339 U. S. 103, 94 L. Ed. 691, 70 S. Ct. 495) and whether any con-

stitutional questions are involved (*U. S. ex rel. Innes v. Hiatt*, 141 F. 2d 664). However, civil courts will not review the merits of a case tried before a court-martial (*Yamashita v. Styer*, supra; *Humphrey v. Smith*, 336 U. S. 695, 93 L. Ed. 986, 69 S. Ct. 830; *Sanford v. Robbins*, 115 F. 2d 435).

"The judgment of a military court or court-martial, properly constituted, is res judicata, and its proceedings are not open to review in any other court": Wharton's Criminal Evidence (12th ed.), Vol. 2, §642, p. 534. In *Ex parte Reed*, 100 U. S. 13, 23, 25 L. Ed. 538, it was said concerning a court-martial: "It is the organism provided by law and clothed with the duty of administering justice in this class of cases. Having had such jurisdiction, its proceedings cannot be collaterally impeached for any mere error or irregularity, if there were such, committed within the sphere of its authority. *Its judgments, when approved as required, rest on the same basis, and are surrounded by the same considerations which give conclusiveness to the judgments of other legal tribunals, including as well the lowest as the highest, under like circumstances. . . ."* (Emphasis supplied). See also: *Dynes v. Hoover*, 20 How. 65, 15 L. Ed. 838; *Swaim v. U. S.*, 165 U. S. 553, 41 L. Ed. 823, 17 S. Ct. 448.

We have no authority to inquire into or review the record of a court-martial; its judgment is conclusive on this and other civil courts, except as set forth, supra. At the time this court-martial was summoned, the defendant was in the military service and therefore subject to military law: the offenses charged were against military personnel. The jurisdiction of the court-martial over both the person of the defendant and the offenses charged is obvious from the record. No collateral attack on this conviction has been made. We are bound by this record, as by the record of any civil

court of competent jurisdiction. That subsequent to World War II a new method of reviewing the actions of courts-martial has been provided by the Congress is of no significance in the instant case, in the absence of any evidence or even suggestion, that the defendant was not properly convicted or that the reviewing officer failed in his duty. The defendant's conviction of three separate offenses of violence was properly admitted into evidence by the Court below.

In this connection it is necessary to point out that the defendant in his testimony at the first trial—admitted, without objection, at the second trial—admitted having shot the three soldiers while in England. The court-martial record merely confirmed the defendant's admission. Even without the admission of the court-martial record, the fact of the prior offense of the defendant would have been before this jury, without any objection by the defendant. Under these circumstances, even if the admission of the court-martial record was error—which it was not—such error would have been harmless.

The third assignment of error concerns an alleged writ of habeas corpus which was not filed nor docketed until after the conclusion of defendant's trial. There is nothing on record before us to indicate when the writ of habeas corpus was received by the Court below. All that is indicated is that the writ was filed after the trial, heard by the Court below and dismissed. We have before us no appeal from that action of the lower Court nor anything upon which to predicate a finding that the defendant's rights were in any manner prejudiced or harmed in this respect. It is fundamental that a writ of habeas corpus does not act as a supersedeas to delay a proceeding such as a homicide case. As a matter of fact there is on record nothing to indicate the basis upon which the writ was requested. We find no error in this respect.

In accordance with the Act of February 15, 1870, P. L. 15, §2, 19 PS §1187, we have reviewed both the law and the evidence in this record and have determined that all the ingredients necessary to constitute murder in the first degree have been proved to exist.

It may not be amiss to point out that this defendant on two separate trials before two different juries has been found guilty of murder in the first degree with the death penalty attached. Almost eight years have elapsed since the shooting took place. During that period of time both in the State and the Federal Courts the defendant has had full and complete opportunity to present his cause; his rights have been properly and adequately safeguarded and protected; every consideration and protection known to the law have been afforded him. The killing of which he stands accused was a cold blooded killing; after a fair and impartial jury trial he again stands convicted of murder in the first degree. The language of the late Mr. Justice JACKSON of the U. S. Supreme Court in *Stein v. N. Y.*, 346 U. S. 156, 197, 97 L. Ed. 1522, 73 S. Ct. 1077, is particularly applicable: "The people of the State are also entitled to due process of law".

The judgment is affirmed and the record is remitted to the court below for the purpose of execution.

Mr. Chief Justice JONES concurs in the judgment of affirmance.

Mr. Justice COHEN took no part in the consideration or decision of this case.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

Our state government is made up of three departments: the legislative, judicial, and executive. Each one has its own responsibilities and functions, and none has the right to take over powers and duties appertaining to the others. Thus, this Court cannot constitute itself a seven-man legislature and create laws. Yet,

from time to time, it does that very thing. It has done that in the matter which is the subject of the present appeal.

On May 14, 1925, the Pennsylvania General Assembly enacted a statute which reads, inter alia, "That every person convicted of the crime of murder of the first degree shall be sentenced to suffer death in the manner provided by law, or to undergo imprisonment for life, at the discretion of the jury trying the case, which shall fix the penalty by its verdict."*

It will be noted that the statute says nothing about evidence, is utterly silent on the subject of procedure, is barren of any suggestion of change in the proof required to prove first degree murder, and offers no invitation to alter the accepted and established mode of establishing the crime charged and on which the jury is to render its verdict. This Court, in complete defiance of the plain intendment of the Legislature, has rewritten the statute so that it reads in effect: In the trial of any person charged with murder, the Commonwealth may introduce evidence of previous convictions so that the jury may determine, in the event they find the defendant guilty of first degree murder, whether the defendant should suffer death or life imprisonment. This rewriting of the statute, which was originally done in 1928, and has been affirmed by practically every group of judges forming the Supreme Court since then, represents to me an invasion of the Pennsylvania Constitution, a denial of due process guaranteed by the 14th Amendment to the Constitution of the United States, and a repudiation, without cause, of one of the most fundamental rules of criminal law and procedure. The present Court had an opportunity

---

* This statute was re-enacted on June 24, 1939 (Act of June 24, 1939, P. L. 872, §701), with a slight alteration in phraseology which in no way changed the intent and purpose of the original Act.

in the instant case to bring the statute of 1925 back to what it was when it left the legislative halls on Capitol Hill, but it prefers to perpetuate the error of all the previous Courts and, by adding another affirmance of the unconstitutional procedure, solidify the mortar attaching this incongruous gargoyle of misconstruction to the beautiful temple of the law.

Nothing can be more firmly established in Anglo-American criminal procedure than the proposition that in a prosecution for a particular crime, a distinct crime unconnected with that laid in the indictment cannot be given in evidence against a prisoner as substantive proof of the crime for which he is being tried. It is simply elementary that in trying A for the alleged killing of X, it cannot be shown that some time in the past he robbed Y. All our authorities are in accord on this rudimentary proposition.* There are, of course, some exceptions to this rule but none of them apply in the case on appeal before us.

Cleveland Thompson, the defendant here, was indicted and tried on a charge of murder arising out of a killing which occurred in Pittsburgh on September 13, 1949. During the trial, the Commonwealth introduced a court record to show that in 1940, Thompson was convicted of a felonious assault and battery and was sentenced to the Allegheny County Workhouse for a term of from 6 to 18 months. It introduced also a court-martial record to the effect that on November 27, 1942, while Thompson was serving with the armed forces of the United States in England, he committed an assault with intent to commit murder on another soldier, and an assault with intent to commit bodily harm on two other soldiers. He was court-martialed for these offenses and was sentenced for an undisclosed period to a Disciplinary Center in Somerset, England.

---

* *Commonwealth v. Williams*, 307 Pa. 134.

The defendant objected to the introduction of these records.

It will be noted that the court-martial offenses occurred *seven years* prior to the killing of September 13, 1949, and the Allegheny County crime occurred *nine years* prior to the murder on which Thompson was being tried. In point of geography, chronology, and subject matter, these previous offenses had no possible connection with the killing in September, 1949. They were so remote in relevancy that they could have been committed by a different person entirely. It is unquestioned that prior to 1925 the record of these previous offenses could not have been introduced against Thompson. Even if Thompson were to have admitted committing them, he could still be innocent of the murder of September 13, 1949. The whole genius of our criminal law is predicated upon the proposition that every possible distracting and irrelevant fact must be excluded from a trial so that the jury may decide the immediate issue, entirely uninfluenced and unprejudiced by other unrelated and unconnected episodes.

The Commonwealth does not dispute that generally it would have no right to introduce the records mentioned.* It argues, however, that it was warranted and practically required to do so because of the Statute of 1925. Of course, the able and veteran assistant district attorney trying the case, Samuel Strauss, was only following what was laid down by this Court in 1928 in the case of *Commonwealth v. Parker,* 294 Pa. 144, and echoed by this Court ever since. I submit that

---

* There has been some discussion as to whether a court-martial record constitutes a court record which can be introduced in a civil criminal trial. I do not go into this discussion at all because, in my view of the case, even if the court-martial does qualify as a proper record, it was improperly introduced for the purpose specified.

when this Court decided that under the Act of 1925 the Commonwealth could demand a punishment for crimes which had already been adjudicated, it was not judicially deciding a case, it was legislating; it was not rendering a judgment, it was recording a legislative fiat; it was not acting upon precedent, it was proceeding under self-assumed powers. All this, of course, it had no right to do, even though no one could rise up to thwart this arrogation of authority.

The judicial personage most responsible for this deviation from the statutory path so clearly delineated by the Act of 1925 was Chief Justice VON MOSCHZISKER. Writing for the Court, he said in the *Parker* case, that, because of the Act of 1925, the jury should be allowed "the same sort of information that a judge considers when deciding as to punishment for crime." Of course, he possessed no authority whatsoever for such a pronouncement. To bestow on a jury the powers, authority, and responsibility of a judge requires more than the dictum of a justice of the Supreme Court, learned, conscientious, and dutiful as he may be. Chief Justice VON MOSCHZISKER said further: "Does not the discretion now vested in the jury as to the punishment to be administered dictate that there should be a more liberal rule of evidence applicable to a case like the present?" He then erroneously answered his self-asked question in the affirmative. Even if the stream of judicial interpretation were to be widened to the dimensions of the Mississippi at its greatest expansion, one could never find in the Act of 1925 the slightest suggestion, hint, or intimation that it authorized the liberalization of the rules of evidence. To widen the rules of evidence without authority is to remove trials from the courthouse to the market square where rumor, gossip, and the sheerest irrelevancy may condemn sovereign authority itself.

Chief Justice VON MOSCHZISKER would never have arrived at his illogical conclusion if he had given some attention to the purpose of the Act of 1925 and the meaningful history which preceded its enactment. The Act of 1925 had but one purpose, and that was to introduce for the first time in Pennsylvania the penalty of life imprisonment as punishment for first degree murder. The authors of that bill would certainly never recognize it in the form into which it was tortured by Chief Justice VON MOSCHZISKER and all the justices who have laid a hand to it since 1925.

For years, decades, and even centuries the debate had raged (which in many respects has not yet died away) as to the wisdom, humanity, and practicality of the death sentence. There were (as there are today) those who felt that in the interests of the protection of society, certain malefactors should be put to death. There were others who believed (as they believe today) that capital punishment offends against the Sixth Commandment, that it is not a deterrent, and that the act of the State in killing its citizens offers an example of brutality which can only have a degrading effect on the people at large. In America this debate began with the landing of the first colonists and it has continued to the present. Interest in the controversy has risen and fallen, depending on the state of the public affairs of the day. In Pennsylvania the forces working for abolition of the death penalty had on several occasions come within striking distance of their goal, but they were never able to muster enough votes in the Legislature to bring about an outright repeal of the death penalty. However, by 1925 they had gained some effective allies, not from abolitionists like themselves, but from the enemy camp, namely, those who still advocated the death penalty but were aware that frequently juries returned second degree murder verdicts

only because a first degree murder verdict meant death for the defendant. It was also known that juries often accompanied their verdicts of first degree murder with a recommendation of mercy because they found extenuating circumstances in the commission of the murder which should save the defendant from the ultimate penalty of death. Of course, despite such recommendation, the judge was compelled by law to impose the death sentence.

In 1925, then, the whole problem was settled by a compromise and there was born in Pennsylvania the statutory penalty of life imprisonment for murder. This was done without abolishing the death penalty because the jury trying the case was empowered to decide whether the punishment in that particular case should be life imprisonment or death. It was left to the jury making the decision to reach its conclusion on the evidence in *that* case. Not on other evidence. Not on extraneous episodes. But on the same evidence which would sustain the verdict of first degree murder. Since, prior to 1925, juries could and did return verdicts of first degree murder (which meant death) without hearing evidence on unrelated prior convictions, why would it be necessary, now that they were allowed to return a lesser penalty, to hear evidence in magnification of the prisoner's criminality?

Throughout the entire controversy, both in the Legislature and in the forum of public discussion, so far as I have been able to discover, not once was it suggested by anyone that in a murder case the jury was to sit as the Great Judge on Judgment Day to render judgment on the accused's whole life. So far as procedure was concerned, the law was to remain as it always was, namely, the jury would pass *only* on the issue presented to it by the indictment. Let us look again at the Act of 1925: "That every person convicted

of the crime of murder of the first degree shall be sentenced to suffer death in the manner provided by law, or to undergo imprisonment for life, at the discretion of the jury trying the case, which shall fix the penalty by its verdict." Without looking through the spectacles of a Draco, can anyone discover in these words, as transparent as a freshly washed window, anything about liberalization of the rules of evidence? Does not this statute, in terms as plain as the sun in the heavens, state that the jury trying the case shall decide the penalty of life and death on the same evidence which carried the jury to the conviction of first degree murder?

Does this unostentatious statute perform the Herculean task of tearing down the walls which have always protected the accused from extraneous influences? If so, how?

Chief Justice VON MOSCHZISKER embarked on an intellectual excursion all his own when he said in the *Parker* case: "The Act of 1925 was not passed to help habitual criminals, and we take judicial knowledge of the fact that offenders of that designation have become so general that the law, not only lex scripta but non scripta, must advance to protect society against them." To say that the Act of 1925 was not passed to help habitual criminals is merely a satirical audacity. Of course, it was not passed to help habitual criminals, but neither was it passed to deny to the accused in a criminal trial those safeguards which have been guaranteed to all accused from the earliest days of the common law. Many of the decisions of this Court, including the present one, which have followed the *Parker* case have quoted VON MOSCHZISKER's outburst of satire, but such fulminations against criminals do not aid in the dispassionate determination of guilt and innocence.

It is true that in order to arrest the progress of crime, criminals must be withdrawn from society, just as in arresting the progress of cancer it sometimes becomes necessary to amputate a limb or remove an important organ. But such amputation and such removal is not ordered by the consulting physicians and surgeons until there remains no doubt that the limb or organ is incurably affected. To say that the Act of 1925 was passed to protect society against criminals is to put the moral cart before the just horse, because the duty of the jury is to determine if the accused is guilty of the crime with which he is charged and not to decide whether he should be eradicated from the living on account of offenses he has committed in the past, for which, incidentally, he has *already* paid his debt to society.

The Majority Opinion says in the case at bar that: "For almost three decades in Pennsylvania it has been a well established and recognized rule of law that evidence of prior offenses committed by the defendant, whether proven by records of prior convictions, by written or oral statements made by the defendant or elicited upon cross-examination of the defendant, is admissible in a homicide trial."

In the history of the law, three decades is a very short time, but even if the indicated practice had existed for centuries and it was founded on an unjust premise, it still would be wrong. Age does not give strength to a crumbling viaduct, nor does the concealing ivy of years repair the rent beneath.

What this Court says in effect is that if the murder of which the defendant is convicted is of a comparatively mild character, one which merits only life imprisonment, the Commonwealth may introduce evidence of some robbery or burglary committed by the defendant ten or twenty years before, and this knowledge

may supply to the jury the necessary emotional anger which will impel them into returning a verdict with the death penalty. Of course, the defendant would already have expiated this previous offense or offenses, but that does not matter. He must still go on answering until he is dead, by natural causes or otherwise. If this is the reasoning behind this Court's interpretation (or rather re-writing) of the Act of 1925, what then happens to the doctrine of expiation and of reformation? Does it mean that once a person transgresses the law of the land, he must carry around his neck a knotted rope which may be pulled taut any time he gets into trouble again? This Court has gone so far as to say that even if a convicted felon receives a pardon from the sovereignty of the State, the fact of his conviction may still be introduced as evidence against him in any future criminal trial in which he is a defendant!*

The prior record doctrine enunciated in the *Parker* case was re-affirmed in *Commonwealth v. Mellor*, 294 Pa. 339, *Commonwealth v. Dague*, 302 Pa. 13, and *Commonwealth v. Flood*, 302 Pa. 190. And then came the vital case of *Commonwealth v. Williams*, 307 Pa. 134, decided in 1932, in which Justice KEPHART (later Chief Justice) reviewed the previous cases with approval and added an additional reason for broadening the rules of evidence in applying the Act of 1925. He said that the jury should be permitted to hear the defendant's prior record "in *aggravation* of the penalty." ** But if the death penalty is at all in order, it is authorized because the facts of the indicted crime dictate the death penalty, not because other unconnected events are supposed to "aggravate" the penalty.

And then, if evidence may be presented by the Commonwealth to "aggravate" the penalty, why shouldn't

---

\* *Commonwealth v. Cannon*, 386 Pa. 62.

\*\* Italics throughout, mine.

the defendant be allowed to introduce evidence to mitigate the penalty? Justice KEPHART saw many difficulties in allowing proof of mitigating circumstances in that case. He said: "If such evidence as here offered is admitted in mitigation of the penalty, there would be no end to the testimony that might be produced in a homicide case, nor would there be any limit to the collateral issues that the jury might be called upon to consider; the Commonwealth's case under such rule would be in grave danger of being lost sight of."

If "mitigating" circumstances will introduce collateral issues, do not "aggravating" circumstances also introduce collateral issues? This very discussion on mitigation and aggravation of penalty shows into what a labyrinth this Court has led the law by refusing to take the Act of 1925 as it was written. Chief Justice VON MOSCHZISKER first left the highway of statutory exactness, Chief Justice KEPHART took the law deeper into the woods of incongruity, but Chief Justice MAXEY headed an expedition into the quagmire of contradiction and confusion, and then, becoming lost, refused to accept the compass and lantern supplied by the Legislature which would have brought the law back to the terra firma of reasonableness and precision. All of which will be demonstrated later.

One of the proudest boasts of our whole system of civil and criminal procedure is the zealous manner in which we prevent diversionary streams from pouring into the main current of a lawsuit, contaminating and confusing the main issue. What is the issue in this case of *Commonwealth v. Thompson?* It is not whether Thompson's *whole life* has been such that he should be permanently and irrevocably removed from society, but whether he committed a certain murder in the city of Pittsburgh on September 13, 1949. Instead of keeping the evidence within the channel of that inquiry

the Trial Court broke down the barriers of bordering pools and mud ponds, mixing and tainting the waters of the main controversy so that no one can now tell how much of the jury's verdict was based on the evidence of the indicted murder and how much was based on what Thompson did in England seven years before.

In allowing this irrelevant flooding of the main issue, the Trial Judge, of course, was merely obeying what this Court has been saying since 1928. He was following what Justice KEPHART said in the case of *Commonwealth v. Kurutz*, 312 Pa. 343, 348, namely, that the jury should "have before it the past deeds of the accused that it may be fully advised of his nature and deserts when it fixes the penalty to be suffered by him." In that case the Commonwealth was allowed to show that prior to the killing, which was the subject of the trial, the defendant had fired a revolver at his first wife after she had procured a divorce against him. This episode had not the slightest relevancy to the killing on which he was tried. But, thrown in to the mainstream of the trial as it was, how can we be certain that the jury did not find the defendant guilty of murder more because of the fact that he attempted to shoot his divorced wife than that they believed he merited the death sentence because of the killing which was the subject of the indictment?

It is utterly amazing to me with what insouciance this Court overthrew in 1928 one of the most formidable guarantees of a fair trial and how it has gone on complacently approving this violent displacement of a rule, without which a fair and just trial is impossible. Justice JONES (now Chief Justice), in the case of *Commonwealth v. DePofi*, 362 Pa. 229, 251, to which reference will be made later *in extenso*, made this trenchant observation: "The thing [introduction of a previous criminal record] could, and no doubt has, actually

worked out in practice in a truly shocking way. It is not beyond the range of possibility that where, upon a trial for murder, the defendant's guilt is doubtful under the evidence, the balance may be tilted in favor of a conviction because of the subconscious effect of the impression made on the minds of the jury by the evidence of the defendant's prior criminal record."

Justice BELL, in the case of *Commonwealth v. Lowry*, 374 Pa. 594, 603, said that "many Judges, including the writer of this opinion, believe that a record of prior crimes should not be admissible even under the theory of aiding the jury in fixing the penalty as permitted by the Act of May 14, 1925, P. L. 759." He went on further to say, however, that "this Court has repeatedly held such records to be admissible for the limited purpose of aiding the jury in determining the penalty if they find a defendant guilty of murder in the first degree." Justice BELL thus felt we are bound by the prior pronouncements of this Court on the subject. I believe those pronouncements wrong, and to have been wrong from the beginning. Therefore, they should no more be followed than a motorist should obey a road sign which leads to a visible precipice. The time has indeed come, with a fresh reappraisal, to repudiate *Commonwealth v. Parker*, to overrule *Commonwealth v. Mellor*, to negative *Commonwealth v. Flood*, to reject *Commonwealth v. Williams*, to annul *Commonwealth v. DePofi*, and to disclaim all other cases which have given spurious authority to the revolting proposition which says that a defendant on trial for his life may be crippled by evidence which has no bearing on the indictment, which he is unable to combat, which prejudices him in the eyes of the jury, and eventually subjects him to a verdict not dependent alone, if at all, on the facts of the crime with which he is charged.

Not only is the prior record rule, as here outlined, bad, but it gets worse with the passage of time. Abuse feeds on abuse. Usurpation knows no verge. The story of the camel that asked only for shelter for his nose and finally pushed his master out of the tent has its counterpart in nearly every field of endeavor. In the case of *Commonwealth v. Williams*, 307 Pa. 134, it was said that the admissible prior record must be limited to crimes "committed for profit, such as the crimes of highway robbery, burglary, murder for life insurance, bank holdups, and the like, *and* that the criminals are habitual offenders against society." It will be noted that, in order to make that prior record available, two elements had to concur: serious crimes as enumerated *and* the criminal must be a habitual offender against society. There is nothing in the testimony presented in this case which establishes that Thompson was a habitual offender against society. Thus, the rule which was indefensible from the beginning is now being extended to an even more indefensible degree. In *Commonwealth v. Simmons*, 361 Pa. 391, the rule was accepted as satisfied with the showing that the defendant had committed a robbery. In *Commonwealth v. Lowry*, 374 Pa. 594, the Commonwealth was permitted to show that the defendant had previously committed four larcenies. In *Commonwealth v. LaRue*, 381 Pa. 113, it was shown that the defendant had previously been convicted of one armed robbery. Then in the case of *Commonwealth v. Cannon*, 386 Pa. 62, this Court threw off all restraint and laid down the astounding proposition that: "Neither reason nor authority limit the admissibility of prior convictions to cases where the defendant was either a professional criminal or his crime was one of sordid passion." In other words, there is no limit to what may be introduced in the way of irrelevant crimes, so long as it may stir the jury into

rendering a verdict with the death penalty, while adding unjustified strength to the Commonwealth's case against the defendant on the indicted crime.

It might be in order here to take a look back to see how this Court has got itself into its present untenable position. Up until 1909, there was never any doubt that the law in Pennsylvania prohibited the Commonwealth from dragging into a criminal trial, evidence of prior crimes entirely disassociated from the crime which was the subject of the trial. In that year, 1909, in Lawrence County, in the murder case of *Commonwealth v. Racco*, 225 Pa. 113, the district attorney prosecuting the case decided to circumvent the rule prohibiting the introduction of a prior record, by asking the defendant whether he had not already been convicted of crime. The defendant did in fact have a criminal record. The district attorney's question thus threw him on to the horns of a double dilemma. If he denied the prior record he would be guilty of perjury. If he admitted it, he lessened his chances for an acquittal of the crime for which he was then being tried. His counsel objected to the question, was overruled, and the defendant compelled to answer. He was convicted. Thus the district attorney was permitted to bring in by the back door of cross-examination what the law for centuries had kept away from the front door of direct evidence. On appeal, this Court affirmed the conviction by explaining that when the defendant offered to testify in his own behalf, his credibility became a question for the jury. Justice Brown, writing for the Court, said further: "Under our statute permitting him to testify no restriction was placed upon the limit of his cross-examination." This, of course, was sheer sophistry, because all limitations to cross-examination which appear in the law of the land must perforce remain, unless specifically eliminated which they certainly were

not in the statute referred to. The *Racco* decision met with much criticism at the bar and in the Legislature. Accordingly on March 15, 1911 (P. L. 20), the General Assembly passed an Act to prevent a repetition of the *Racco* performance. It read: "An Act Regulating in criminal trials the cross-examination of a defendant, when testifying in his own behalf. Hereafter any person charged with any crime, and called as a witness in his own behalf, shall not be asked, and, if asked, shall not be required to answer, any question tending to show that he has committed, or been charged with, or been convicted of any offense other than the one wherewith he shall then be charged, or tending to show that he has been of bad character or reputation; unless,—One. He shall have at such trial, personally or by his advocate, asked questions of the witness for the prosecution with a view to establish his own good reputation or character, or has given evidence tending to prove his own good character, or reputation; or, Two. He shall have testified at such trial against a co-defendant, charged with the same offense."

This statute barred the back door as well as the front door, and balance was restored in this department of the criminal law. In January, 1923, in the case of *Commonwealth v. Gibson,* 275 Pa. 338, this Court, speaking through Justice WALLING, re-affirmed the ancient rule that a defendant can only be prosecuted on the charge for which he is standing trial. In that case, the sister of the defendant, indicted for murder, was asked if the defendant had not been convicted of shooting another member of the family. Objection was made by defense counsel, but the witness was required to answer. The defendant was convicted and appealed. In reversing the conviction, Justice WALLING said: "The statement, however, brought directly to the knowledge of the jury, not only the fact that defend-

ant had shot his brother but also that he had been convicted of it. *This was a violation of the fundamental principle that in the trial of a prisoner for one crime the Commonwealth cannot introduce evidence of his guilt of another independent crime."*

Then came the Act of 1925, and the sharpening of the quill by Chief Justice VON MOSCHZISKER. We will remember that the Act of 1925 said nothing about prior records or cross-examination. It was not an evidence statute at all. Chief Justice VON MOSCHZISKER'S rewriting of that statute was bad enough, but Justice KEPHART (later Chief Justice) went further. In 1930, through the case of *Commonwealth v. Flood,* 302 Pa. 190, he unlocked the back door which had been sealed by the Act of 1911. In that *Flood* case, the district attorney asked the defendant on cross-examination a question intended to develop an answer which would show the defendant had committed another crime, entirely disassociated and separate from the offense for which he was in court. The defendant objected, lifting in protection the shield of the Act of 1911 which forbade in so many words exactly what the district attorney was doing. The objection was overruled and, on conviction, the defendant appealed to this Court, where the shield was splintered. Justice KEPHART, speaking for the Court, said that so far as murder cases were concerned, the Act of 1911 was nullified by the Act of 1925.

I repeat once more the Act of 1925: "That every person convicted of the crime of murder of the first degree shall be sentenced to suffer death in the manner provided by law, or to undergo imprisonment for life, at the discretion of the jury trying the case, which shall fix the penalty by its verdict." Does this Act say anything about repealing the Act of 1911? Does

it say anything about extending the scope of cross-examination?

The Legislature must have been considerably annoyed at what the Supreme Court was doing in the name of law-interpreting. And so, to end the Court's invasion of the rights of accused persons, it passed the Act of July 3, 1947 (P. L. 1239), which revived the Act of 1911 and served notice on the Supreme Court that it must no longer tamper with the fundamental guarantees of the people of Commonwealth. The Act of 1947 proclaimed that "In the trial of any person charged with crime, *no evidence shall be admitted which tends to show that the defendant has committed, or has been charged with, or has been convicted of any offense, other than the one wherewith he shall then be charged, or that he has been of bad character or reputation* unless,

"One. He shall have at such trial, personally or by his advocate, asked questions of the witness for the prosecution with a view to establish his own good reputation or character, or has given evidence tending to prove his own good character or reputation; or,

"Two. He shall have testified at such trial against a co-defendant, charged with the same offense.

"Three. The proof that he has committed or has been convicted of such other offense is admissible evidence as to the guilt or the degree of the offense wherewith he is then charged."

Then came the monumental case of *Commonwealth v. DePofi,* 362 Pa. 229. At the trial of that murder case the district attorney, in spite of the Act of 1947, introduced in evidence 15 indictments on prior offenses, none of which was connected or related in any way to the crime for which DePofi was being tried. Upon conviction the defendant appealed, assigning as error the production of the prior record indicated. This Court

affirmed the conviction in an Opinion which abounds with illogicalities, non sequiturs, and casuistries on nearly every one of its 18 pages. Chief Justice MAXEY, author of the Opinion, declared the Act of 1947 to be unconstitutional on the assertions (1) that it violated Article III, Section 3 of the Pennsylvania Constitution which requires the subject of a statute to be expressed in the title and (2) that it was vague and uncertain and therefore inoperative.

Chief Justice JONES (then Associate Justice), in a very powerful Dissenting Opinion, completely devastated both of the Majority arguments. So far as the title was concerned, he pointed out that the Act of 1947 was an amendment to the Act of 1911 and, when an amendment is germane to the subject matter contained in the original act, it is enough, in the title of the amendment, to specify the particular Act it amends. The title to the Act of 1947, was very specific: "An Act To amend section one of the act, approved the fifteenth day of March, one thousand nine hundred eleven (Pamphlet Laws 20), entitled 'An Act regulating in criminal trials the cross-examination of a defendant when testifying in his own behalf,' by further providing what evidence is or is not admissible." Nor can it be doubted that the subject of the Act of 1947 was germane to the Act of 1911 since it particularly had to do with evidence admissible in criminal cases.

The other reason announced by Chief Justice MAXEY in declaring the Act of 1947 unconstitutional lacked even less merit than the one just described. He found that subsection 3 of the Act was "ambiguous and a prolific source of trouble in the administration of criminal justice." Chief Justice JONES, in his Dissenting Opinion, found nothing ambiguous in the subsection indicated, nor do I, but even if it were to be admitted, arguendo, that subsection 3 presented difficulties, there

certainly was no question about the clarity, directness, and efficacy of subsections 1 and 2 which, in themselves, would have excluded DePofi's previous record. As Chief Justice JONES so cogently put it: "Even should the third exception of the Act of 1947 be so unintelligible as to be unworkable (which, of course, it is not), the invalidity would attach only to the third exception. How could it possibly affect the balance of the Act which, elsewhere, makes inadmissible *in the Commonwealth's case* evidence of a defendant's prior offenses? The Act of 1911, with its two exceptions, stood on the books for years and was never assailed as unworkable; those two exceptions still remain in the Act of 1947; and the amended body is plain enough.

"The obvious purpose of the Act of 1947 was to make inadmissible in trials for murder *any* evidence *either in the Commonwealth's case* or by cross-examination of a defendant concerning unrelated offenses except where such evidence is expressly allowed by one or more of the three exceptions specified by the statute." (Italics in original.)

Chief Justice MAXEY, in building his argument of affirmance of the DePofi conviction, did not fail to use as one of his main props the same moth-eaten, tottering pillar, which had been hammered together by Chief Justice VON MOSCHZISKER 21 years before, namely, that "the Act of 1925 was not passed to help habitual criminals."* Who would know better than the Legislature what was the intendment of the Act of 1925? But even if it were to be admitted, for the purpose of hypothesis, that VON MOSCHZISKER'S sarcastic jibe had some substantial meaning, it would have to be conceded that the Legislature had the same source of knowledge and data

---

* Chief Justice MAXEY overlooked the fact that there are other laws protecting society from habitual offenders.

on criminal procedure as was available to the Supreme Court. Thus, whatever the situation happened to be in 1925 and the years following, the Legislature was aware of it. Accordingly, when it passed the Act of 1947, it certainly intended that the Courts should respect the expression of the sovereign power of the Commonwealth and see to it that in murder trials the prosecution would not introduce prior records, regardless of the interpretation which had been placed on that Act by the Supreme Court. From 1928 to 1947 the Legislature had had nearly 20 years to observe the effects of the *Parker* decision. The Act of 1947 was based on the knowledge of what had happened in those 20 years. The action of this Court then, in the *DePofi* case, in striking down the statute of 1947 was sheer judicial usurpation, which action has not gained any added dignity because it is cloaked in the dust of ten years.

There is another and even more impelling reason why this Court should repair the distressing damage which has been done by the *Parker* decision and those which have stumbled in its train. Every Opinion writer of this Court who has attempted to justify a procedure which on its face is not entirely satisfactory, not entirely fair, and not entirely just, has asserted that when a prior record is used, it is used only for one purpose, namely, to assist the jury in deciding the penalty—after they have determined the first degree murder guilt. The Opinion writers have assured the legal world that under no circumstances must the jury consider the prior records as evidence in determining the guilt or innocence of the defendant on the charge for which he is standing trial. Not one of these Opinion writers, however, has ever explained how the cat was to be belled. To say that a jury will consider the prior record if, and only if, it first decides the defendant is guilty of the indicted crime, is an equivocation which

amounts almost to a deception. Let us look at what happened in the case at bar in this respect.

The Thompson murder trial began on May 21, 1956. On May 24th, three days later, the Commonwealth introduced the record of the previous offenses. The trial ended on May 29th. Thus, for five continuous days, the jury saw the defendant through the blackening screen of his previous record. During all the time that the defendant was presenting his defense on the charge of the murder committed in September, 1949, the jury was thinking of what he had done in November, 1942. Strive as hard as they might, how could they sweep from their minds the consciousness and the knowledge that they were trying a man who already had been condemned by the law?

The Majority Opinion says that the trial judge must emphasize to the jury that they are to limit their consideration of the prior record to a determination of the penalty. How much did the Trial Court in this case emphasize that point? This is what the Court said: "You are informed that these records cannot be considered by you in passing upon the question of the guilt or innocence of the defendant; and you must clearly understand that. The question of guilt or innocence must be determined under the evidence in this case, without consideration of those records. If you come to the conclusion of returning a verdict of murder in the first degree, then you come to the question of considering the other offenses."

When the Judge so instructed the jury, they had *already* been considering for five days the prior record of the defendant. Could they strain out the prior record from the evidence on the present case and consider that evidence alone? The human brain is not divided into water-tight compartments which hold ideas and memories incommunicado and sacrosanct from each

other. A stone and steel wall can stop a cannon projectile but nothing can stop a thought. In fact, there is this paradox about mental images. Once the guardian of the mind is instructed that a certain idea must not be considered in connection with another idea, the forbidden concept will dart into every prohibited area. Even Chief Justice VON MOSCHZISKER recognized this, because he said in the *Parker* case "It may be that, if under any circumstances evidence of other offenses than the one on trial is admitted as helpful to the jury in the performance of its duty in assessing the punishment, *such proof will inevitably be used by it in determining the guilt of the prisoner.*" (p. 154.) He added, however, that "this is not an insurmountable objection." How did he propose to surmount the objection? He did not say, except to cite a Kentucky case and observe, "if the admission of such evidence is hard on the defendant, it is a burden which he must bear." Must a defendant be content with cynicism when he asks for justice? Who said that it is a burden which he must bear? The Act of 1925 does not say so. The common law does not say so. Fair play does not say so.

Do Courts engender respect for law when they lay down rules which do not coincide with recognized human phenomena, which bear no relation to the fundamental law of cause and effect, and which assert what the most unlearned man of the streets knows to be contrary to everyday experience? To expect that jurors can place in the deep freezes of their memories a defendant's prior record, hold it there in unconscious congelation until they have decided the man's guilt, and then take it out, warm it up and consider it in connection with determination of the penalty, is jurisprudential somnambulism.

In his Dissenting Opinion in the *DePofi* case, Chief Justice JONES pointed out the absurdity of expecting

a jury to "keep separate in its 'adjudicating' mind the evidence it heard as to the defendant's guilt and, in its 'penalty-fixing' mind, the evidence as to the defendant's prior unrelated criminal offenses."

As I have stated at length, the Act of 1925 in no way authorizes the flaunting of a defendant's prior record in the faces of the jury, but if it is to be brought into the case at all, it should not be revealed, exhibited, or mentioned until after the jury has reached a verdict of guilty of first degree murder. During the oral argument of this case, defense counsel asserted (and justly) that the defendant had been irremediably harmed by the introduction of his prior record before the adjudication of guilt and was, therefore, entitled to a new trial. One of the Justices remarked that to order a new trial for that reason would be inconsistent with the position this Court had taken in the past, mentioning some of the defendants who had been convicted as Thompson has been convicted. I fail to see how that is a supportable reason for denying an established right. Because the Court has erred in the past is no reason why it should continue to err. Piling error upon error does not finally add up to infallibility.

Since the demolition of the Act of 1947 by this Court, the Legislature has enacted no further legislation on the subject, probably throwing up its hands in what's-the-use helplessness. But there is no need for the Legislature to act if this Court will do what seems to me to be its obvious duty. That duty is to bring the law of criminal procedure in murder trials back to what it was in 1925, before this Court, without removal of judicial robes, assembled to sit as a superlegislature, vetoing the acts of the chosen representatives of the people, and rewriting statutes in accordance with individualistic ideas which cannot be found

in Blackstone or in the code of American justice and fair play.

The great legal principle involved here does not apply only to Cleveland Thompson but to all persons who in the future may become defendants in murder prosecutions. Now that this Court has apparently thrown open the floodgates on all trivial as well as serious offenses of an accused's past, it is possible for an innocent man to be sent to the electric chair not on the evidence of murder but because of the suit of peccadillos which the prosecution forces him to wear. No other State permits so bizarre and tragic a performance. Nothing in history since Justinian, nothing in all the logic of Aristotle, nothing in the mathematics of Euclid, nothing in the science of Newton and Einstein can justify so unAmerican, so unjust, and so unreasonable a procedure.

Without conceding that this is all that can be said on the subject, I dissent.

